FILED
United States Court of Appeals
Tenth Circuit

April 8, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TERRY GUNDERSON,

       Petitioner,

    v.

UNITED STATES DEPARTMENT
OF LABOR,

       Respondent.

_____

BLUE MOUNTAIN ENERGY;
OLD REPUBLIC INSURANCE
COMPANY,

       Intervenors.

No. 08-9537

---

**ON PETITION FOR REVIEW OF THE BENEFITS REVIEW BOARD**
**UNITED STATES DEPARTMENT OF LABOR**
**(No. 07-0619 BLA)**

---

Thomas E. Johnson (Anne Megan Davis, with him on the briefs), Johnson, Jones, Snelling, Gilbert & Davis, P.C., Chicago, IL, for Petitioner-Appellant.

Laura Metcoff Klaus (Mark E. Solomons with her on the brief), Greenberg Traurig LLP, Washington, D.C., for the Intervenors.

Before **HENRY**, Chief Judge, **O'BRIEN**, Circuit Judge, and **EAGAN**, District Judge.[*]

HENRY, Chief Judge.

During his thirty-year employment as a coal miner and foreman, the petitioner, Terry Gunderson, was exposed to coal dust and developed chronic obstructive pulmonary disease. In January 2001, Mr. Gunderson received a letter from the National Institute for Occupational Safety and Health informing him that an x-ray taken as part of a monitoring program indicated that he suffered from pneumoconiosis, "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b). Pneumoconiosis "encompasses a cruel set of conditions that afflict a significant percentage of the nation's coal miners with 'severe, and frequently crippling, chronic respiratory impairment.'" *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 854 (D.C. Cir. 2002) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 6 (1976)).

In response to this letter, Mr. Gunderson sought benefits from Blue Mountain Energy, his longtime employer, under Title IV of the Federal Coal Mine

---

[*] The Honorable Claire V. Eagan, United States District Judge for the Northern District of Oklahoma, sitting by designation.

Health and Safety Act of 1969, as amended, 30 U.S.C. §§ 901-45 (the "Black Lung Benefits Act"). He alleged that he suffered from "clinical pneumoconiosis" and "legal pneumoconiosis." *See* 20 C.F.R. § 718.201 (discussing those two diseases).

The District Director of the Office of Workers' Compensation Programs granted Mr. Gunderson's claim for benefits, but Blue Mountain Energy appealed that decision to an administrative law judge ("ALJ"). The ALJ heard conflicting evidence: Mr. Gunderson's doctors concluded that he suffered from pneumoconiosis arising from coal dust exposure and that he was disabled because of the disease, while doctors testifying on behalf of Blue Mountain Energy opined that Mr. Gunderson's respiratory problems were caused by chronic obstructive pulmonary disease arising from his smoking habit.

After reviewing the evidence, the ALJ rejected Mr. Gunderson's claims. With regard to clinical pneumoconiosis, the ALJ found that the medical reports did not support Mr. Gunderson's contentions. As to legal pneumoconiosis, the ALJ found that the doctors' reports, while conflicting, were all "well-reasoned," "well- documented," and "well-supported." Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22. In the ALJ's view, both parties' experts' opinions were entitled to equal weight. The ALJ therefore denied the claim on the ground that Mr. Gunderson had not met his burden of proving that his chronic obstructive

-3-

pulmonary disease was caused by his work as a coal miner. The Department of Labor's Benefits Review Board affirmed the ALJ's decision.

In this appeal, Mr. Gunderson challenges only the ALJ's ruling regarding legal pneumoconiosis. He argues that the ALJ (1) failed to provide a sufficient explanation of the decision to deny that claim; and (2) erred in excluding a letter from the Director of the Division of Respiratory Disease Studies at the National Institute of Occupational Health and Safety reporting that an x-ray was positive for pneumoconiosis.

We agree with Mr. Gunderson that the case should be remanded for further proceedings. The ALJ's cursory statement that the evidence from both parties was entitled to equal weight does not constitute a sufficient reason or basis for his decision, as required by the Administrative Procedures Act, 5 U.S.C. § 557(c)(3)(A). However, we further conclude that the ALJ did not err in excluding the Director's letter.

## I. BACKGROUND

Most of the relevant facts are not disputed. We begin with Mr. Gunderson's particular circumstances and then turn to the regulatory scheme implementing the Black Lung Benefits Act and the proceedings in this case.

## A. Mr. Gunderson's employment and medical history

Mr. Gunderson worked more than thirty years in underground coal mines, beginning in January 1965, when he accepted a position in Geneva, Utah. In

1973, he became a superintendent of that mine, which required him to work underground half of the time. In 1977, he moved to Colorado and worked as director of operations at a mine there until 1981.

In the 1980s, Mr. Gunderson engaged in a variety of other activities. He ran a retail business with his ex-wife, drove a truck, and did some warehouse work.

Mr. Gunderson returned to coal mining in 1989, when he accepted a position as a safety inspector with Blue Mountain Energy's underground mine in Rangely, Colorado. He was promoted to shift foreman and then to general foreman, and he continued to work at that same mine until January 2004. Throughout much of his career as a coal miner, Mr. Gunderson smoked cigarettes. He began in 1962 and quit in 1996, consuming about a pack each day during that period.

Blue Mountain Energy's Rangely mine produced as much as two million tons of coal each year. The company used continuous mining techniques, including a longwall machine that would produce up to 2,500 tons of coal each hour. At the evidentiary hearing, Mr. Gunderson explained that these mining activities generated large amounts of coal dust. In his words, "[c]oal mining is a dusty business. If you're not eating coal dust, you're blowing rock dust." Rec., Tr. of May 18, 2006 Hr'g, at 34.

Mr. Gunderson reported that his work in the coal mine required extensive physical activity. He sometimes walked 10 to 15 miles a day, often while carrying up to ten pounds of equipment. He also had to lift 30 to 50 pound logs, as well as 75 to 150 pound timbers, which were used to reinforce the roof.

Despite these physical demands, Mr. Gunderson reported little difficulty in doing his coal mining work until the latter part of his career. He testified at the evidentiary hearing that, by 2004, "I couldn't keep up the pace. I was fatigued all the time . . . . I could walk on level ground. I could even walk up some grades. But by the end of the day, I was just so beat, I went home, I walked in the house and flopped in my chair and didn't get up till I went to bed." *Id.* at 44. He further stated that he now lacks the stamina he once had to do chores at home and that, in attempting these tasks, he becomes short of breath. "I do a little bit and then I go sit down and rest. . . . I just don't have the stamina. Seems like I wear out easy." *Id.* at 46.

In the administrative proceedings, the parties introduced substantial medical evidence, providing a detailed account of the onset of Mr. Gunderson's pulmonary disease. In particular, in April 1989, a report of Mr. Gunderson's regular physical examination described him as healthy except for mild, nonspecific interstitial disease, which a radiologist noted on an x-ray.[1]

---

[1] "Interstitial . . . lung disease actually describes a group of disorders, most of which cause progressive scarring of lung tissue. This eventually affects your

(continued...)

Subsequent x-ray readings contained similar findings. In October 1994, a radiologist read Mr. Gunderson's x-ray as showing mild to moderate, nonspecific interstitial disease. In June 1997, the same radiologist concluded that Mr. Gunderson's x-ray revealed chronic obstructive pulmonary disease and mild nonspecific interstitial disease, as well as small areas of atelectasis, a condition in which all or part of a lung becomes airless and collapses.

In July 1997, Mr. Gunderson had a lung scan, which showed a mild deficiency in blood circulation in the upper part of the lungs. That same month, he underwent a stress test on a treadmill, which showed no chest pain or arrhythmia and indicated normal blood pressure. However, in 1998, a radiologist at St. Mary's Hospital read Mr. Gunderson's x-ray and reported that "[t]he lungs are hyperexpanded consistent with underlying emphysema. There is linear scarring at the right lung base." Rec. Employer's Ex. 8, at 56.

In August 2000, Mr. Gunderson reported fatigue and shortness of breath to a family practitioner, who diagnosed chronic obstructive pulmonary disease. That same month, Mr. Gunderson submitted to an x-ray as part of a monitoring program administered by the National Institute of Occupational Safety and Health. In January 2001, he received a letter from Ronald Schell of the Mine

_____

[1](...continued)
ability to breathe and get enough oxygen into your bloodstream. Beyond this, the disorders vary greatly." http://www.mayoclinic.com/health/interstitial-lung-disease/DS00592.

Safety Health Administration informing him that the August 2000 x-ray "[s]hows you have enough coal workers' pneumoconiosis ('black lung') to be eligible for the 'option to work in a low dust area' of a mine." Rec., Director's Ex. 18.

In April 2001, Mr. Gunderson again reported fatigue to a treating physician. In September 2001, a physician at the Western Colorado Lung Center evaluated Mr. Gunderson and diagnosed "[s]imple coal workers' pneumoconiosis" and "probable mild chronic obstructive pulmonary disease" connected to his "[h]istory of tobacco use." Rec. Employer's Ex. 6, at 4.

## B.    Statutory and Regulatory Background

The Black Lung Benefits Act, 30 U.S.C. §§ 901-45, defines pneumoconiosis as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mining employment." 30 U.S.C. § 902(b). "It is caused by inhaling coal dust into the lungs over a long period." *Energy West Mining Co. v. Oliver*, 555 F.3d 1211, 1214 (10th Cir. 2009) (internal quotation marks and citations omitted); *see also Dorlands Illustrated Medical Dictionary* 1315 (28th ed. 1994) (defining pneumoconiosis as "a condition characterized by permanent deposition of substantial amounts of particulate matter in the lungs, usually of occupational or environmental origin, and by the tissue reaction to its presence" and defining coal workers' pneumoconiosis as "a form caused by deposition of large amounts of coal dust in the lungs, typically characterized by centrilobular emphysema"). As coal

workers' pneumoconiosis advances, it may cause physical disability and ultimately "may induce death by cardiac failure, and may contribute to other causes of death." *Usery,* 428 U.S. at 7. Congress enacted the Black Lung Benefits Act to compensate coal miners who have become totally disabled due to pneumoconiosis arising out of coal-mine employment. *See* 30 U.S.C. § 901(a). "To obtain benefits under the [Black Lung Benefits Act], a miner must demonstrate that he satisfies three conditions: (1) he or she suffers from pneumoconiosis; (2) the pneumoconiosis arose out of coal mining employment; and (3) the pneumoconiosis is totally disabling." *Energy West*, 555 F.3d at 1214. Black lung benefits are normally paid by a miner's employer. *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 854 (D.C. Cir. 2002); *see also* 30 U.S.C. §§ 932, 934. If the employer cannot be identified, the claim is paid from the Black Lung Disability Trust Fund administered by the government and financed by a tax on coal. *Nat'l Mining Ass'n*, 292 F.3d at 854.

Although the Black Lung Benefits Act offers a general definition of pneumoconiosis, *see* 30 U.S.C. § 902(b), the statute does not set forth the standards to be used in determining whether a particular lung disease satisfies this definition. However, pursuant to its authority to implement the Black Lung Benefits Act, *see id.* § 936(a), the Department of Labor has promulgated regulations interpreting § 902(b)'s definition of pneumoconiosis to encompass two distinct types of compensable lung diseases: clinical pneumoconiosis and

legal pneumoconiosis. *See* 20 C.F.R. § 718.201(a). This interpretation comports with the approach that many circuits had previously followed. *See Andersen v. Dir., Office Of Workers' Comp. Programs*, 455 F.3d 1102, 1103 n.2 (10th Cir. 2006) (citing those cases).

According to the Department of Labor's regulations, "clinical pneumoconiosis" consists of those lung diseases the medical community refers to as pneumoconiosis—"the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure . . . ." 20 C.F.R. § 718.201(a)(1). These diseases include, for example, "coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment." *Id.*

In contrast, "legal pneumoconiosis" describes a broader class of lung diseases that are *not* pneumoconiosis as the term is used by the medical community. The term includes "any chronic lung disease or impairment and its sequelae" including "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a)(2). A chronic restrictive or obstructive pulmonary disease arises out of coal-mine employment if it is "significantly related to, or substantially aggravated by, dust exposure in coal mine employment." *Id.* § 718.202(b).

-10-

Under the Black Lung Benefits Act, the administrative process begins when a miner or his or her survivor files a claim with the District Director of the Department of Labor's Office of Workers' Compensation Programs. The District Director investigates the claim, notifies the interested parties, and makes a preliminary determination whether the claimant is eligible for benefits and whether a particular mine employer should be held responsible. 20 C.F.R. §§ 725.301 -.422; *see also Nat'l Mining Ass'n*, 292 F.3d at 854 (discussing the benefits claims and appeals process).

After the District Director renders a decision, either party may appeal to an ALJ and request a hearing. In turn, the ALJ's decision may be appealed by either party to the Department of Labor's Benefits Review Board, and, ultimately, to the United States Court of Appeals for the circuit in which the injury occurred. 33 U.S.C. § 921(c). The hearings and appeals are governed by the Administrative Procedures Act, 5 U.S.C. §§ 500-706. *See* 33 U.S.C. § 919(d) (providing that hearings on claims for compensation under the Longshore and Harbor Workers' Compensation Act are governed by the Administrative Procedures Act provision regarding adjudicatory hearings, 5 U.S.C. § 554); 30 U.S.C. § 932(a) (applying § 919(d) to claims for benefits under the Black Lung Benefits Act); 5 U.S.C. §§ 556-557 (establishing requirements for considering evidence and issuing findings that apply when adjudicatory hearings are required under § 554).

C.     **Mr. Gunderson's Claim for Benefits and the Administrative Proceedings**

After he received the January 2001 letter reporting that his x-ray was positive for pneumoconiosis, Mr. Gunderson filed a claim under the Black Lung Benefits Act. The District Director granted his request, finding that Mr. Gunderson suffered from pneumoconiosis, was totally disabled by it, and that Blue Mountain Energy was the responsible operator.

Blue Mountain Energy then appealed to an ALJ and requested a formal hearing. The parties presented conflicting evidence, including x-ray reports, reports from physicians (some of whom examined Mr. Gunderson and some of whom merely reviewed his treatment records), and a 1998 CT scan. Six x-ray reports concluded that Mr. Gunderson had pneumoconiosis. Five x-ray reports found no evidence of the disease, as did the report of the CT scan. Three physicians (Drs. Mark Shockey, Robert Cohen, and John Parker) concluded that Mr. Gunderson had pneumoconiosis, while two other physicians disagreed (Drs. Lawrence Repsher and Joseph Renn).

After hearing this evidence, the ALJ issued a decision denying Mr. Gunderson's claim for benefits. The ALJ addressed both types of pneumoconiosis described by Department of Labor regulations: clinical and legal pneumoconiosis. *See* 20 C.F.R. § 718,201(a).

As to clinical pneumoconiosis, the ALJ concluded that the lack of a definitive indication of "substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure

-12-

in coal mine employment," 20 C.F.R. § 718.201, meant that Mr. Gunderson had not established that he had that disease. The ALJ noted the disagreement among the physicians who had reviewed the x-ray evidence and added that two of the doctors who had found that Mr. Gunderson had suffered from pneumoconiosis (Drs. Cohen and Shockey) had relied on inadmissible expert reports in reaching their conclusions. Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 20. "Given the x-ray evidence available to Dr. Cohen after discounting the inadmissible reports, it seems unlikely that a finding of clinical pneumoconiosis could be maintained." *Id.*

As to legal pneumoconiosis, the ALJ found that there was "clearly a difference of opinion among well-qualified physicians who have given detailed statements in this case." Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 21. The ALJ assessed the conflicting evidence as follows:

> All of the physicians are extremely qualified to discuss [Mr. Gunderson's] pulmonary problems. Except for Dr. Shockey, who did not provide an extensive curriculum vitae, all have had significant experience with internal and pulmonary medicine, including the publication of articles in this field, professional appointments in the field of pulmonary medicine and teaching positions at local universities. Further, all of their reports are well-reasoned and well-documented. Moreover, despite the fact that Drs. Renn and Cohen disagree as to the meaning of some of [Mr. Gunderson's] test results, their findings and reports are each well-supported.
>
> The undersigned finds that these reports are evenly balanced, and should receive equal weight. As is noted above, the Claimant bears the burden of establishing the presence of pneumoconiosis by a preponderance of the

-13-

evidence.  The Claimant has not proven that he has legal pneumoconiosis.

Since the Claimant has not established the presence of either clinical or legal pneumoconiosis, the criteria of § 718.202 (a)(4)[2] has *not* been met.

*Id.* at 22 (footnote omitted).  The ALJ therefore denied Mr. Gunderson's claim for benefits.

In the course of his decision, the ALJ excluded a January 2001 letter from the Director of the Division of Respiratory Disease Studies at the National Institute of Occupational Health and Safety to the Chief of the Division of Health of the Mine Safety Health Administration.  The letter reported the results of a chest x-ray as positive for pneumoconiosis.  However, the referenced x-ray was not included in the record.

---

[2]     That section provides:

A determination of the existence of pneumoconiosis may also be made if a physician, exercising sound medical judgment, notwithstanding a negative X-ray, finds that the miner suffers or suffered from pneumoconiosis as defined in § 718.201.  Any such finding shall be based on objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories.  Such a finding shall be supported by a reasoned medical opinion.

20 C.F.R. § 718.202(a)(4).

In explaining his decision to exclude this letter, the ALJ invoked the Department of Labor regulations that (1) limit the number of x-rays that each party may submit and (2) require x-ray reports to contain specific information:

> The results of this x-ray will not be considered since the Claimant has already designated two x-ray determinations in support of his affirmative case.  Since the limitations set forth in 20 C.F.R. § 725.414 (2003) are mandatory and cannot be waived, CX10 cannot be considered.  Moreover, CX 10 fails to show the date the x-ray was taken, the date the x-ray was read by a doctor, the quality of the x-ray film, the name of the doctor who interpreted the x-ray, the qualifications of the doctor who interpreted the x-ray, or the type of opacities found.  It therefore does not meet the standards for x-rays set forth in 20 C.F.R. §§ 718.202(a)(1); 718.102 (2002).[3]

*Id.* at 7.

Mr. Gunderson filed an appeal of the ALJ's decision with the Labor Department's Benefits Review Board.  Among other arguments, he advanced the two contentions that he now raises in this appeal.  The Benefits Review Board rejected both arguments, and affirmed the ALJ's decision denying Mr. Gunderson's claim for benefits.

---

[3]     These provisions state in part that an x-ray report "shall specify the name and qualifications of the person who took the film and the name and qualifications of the physician interpreting the film.  If the physician interpreting the film is a Board-certified or Board-eligible radiologist or a certified 'B' reader (*see* § 718.202), he or she shall so indicate."  20 C.F.R. § 718.102(c).

## II. DISCUSSION

Mr. Gunderson now argues that the ALJ (1) failed to provide a sufficient explanation of his decision to deny the claim for benefits under the Black Lung Benefits Act; and (2) erred in excluding the January 2001 letter from the Director of the Division of Respiratory Disease Studies.

### A.    Standard of Review

Mr. Gunderson's first argument raises a legal question that we review de novo. *See Stalcup v. Peabody Coal Co.*, 477 F.3d 482, 484-85 (7th Cir. 2007) (examining de novo the question of whether an ALJ in a black lung case provided an adequate explanation for the denial of benefits).

In contrast, in considering Mr. Gunderson's second argument (which challenges a decision to exclude evidence) we afford considerable deference to the agency tribunal. In general, "the formulation of administrative procedures is a matter left to the discretion of the administrative agency." *Laird v. ICC*, 691 F.2d 147, 154 (3d Cir. 1982). This discretion includes the power to make reasonable, nonarbitrary decisions regarding the admission or exclusion of evidence. *See Second Taxing Dist. of City of Norwalk v. FERC*, 683 F.2d 477, 485 (D.C. Cir. 1982). Thus, "ALJs [generally] have broad authority over their hearings," *NLRB. v. Jackson Hosp. Corp.*, 557 F.3d 301, 305 (6th Cir. 2009), and "[w]e review the ALJ's exclusion of the evidence for an abuse of discretion." *Manna Pro Partners, L.P. v. NLRB*, 986 F.2d 1346, 1353 (10th Cir. 1993).

In addition, the Administrative Procedures Act directs reviewing courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. As a result, we may overturn the ALJ's decision only if the error in excluding evidence "prejudicially affect[ed] a substantial right of a party." *See Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998) (applying the prejudicial error rule to a judgment on a jury verdict). An error is prejudicial only "if it can be reasonably concluded that with . . . such evidence, there would have been a contrary result." *Id.* (internal quotation marks omitted).

**B.     The ALJ failed to provide a sufficient explanation of his decision that Mr. Gunderson did not suffer from legal pneumoconiosis.**

Mr. Gunderson first contends that the ALJ failed to comply with the Administrative Procedures Act provision requiring agency tribunals to explain the grounds for their decisions. That provision states that

> [a]ll decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of –
> . . . findings and conclusions, *and the reasons or basis therefor*, on all the material issues of fact, law, or discretion presented on the record;

5 U.S.C. § 557(c)(3)(A) (emphasis added). In Mr. Gunderson's view, the ALJ did not provide "the reasons or basis" for rejecting the legal pneumoconiosis claim. Instead, the ALJ "just threw up his hands, implying he could not decide who was right on a scientific basis." Aplt's Br. at 34.

-17-

In response, Blue Mountain Energy maintains that the ALJ complied with his obligations under the APA.  It further argues that the finding that Mr. Gunderson did not establish his entitlement to benefits is supported by substantial evidence and that the ALJ's credibility findings cannot be revisited by this court on appeal.

## 1.  Section 557(c)(3)(A)'s reasoned explanation requirement

Mr. Gunderson's argument is grounded in fundamental principles of administrative law.  Section 557(c)(3)(A), which he invokes, requires an agency's adjudicative decision to be "accompanied by a clear and satisfactory explication of the basis on which it rests."  *Barren Creek Coal Co. v. Witmer*, 111 F.3d 352, 356 (3d Cir. 1997) (internal quotation marks omitted).  That requirement serves several important interests.

First, it enables appellate courts to engage in meaningful judicial review.  *Id.* In addition, "[an adequate] statement of reasons or findings also helps avoid judicial usurpation of administrative functions, assures more careful administrative consideration, and helps the parties plan their cases for judicial review."  *Id.*; *see also Dakota Underground, Inc. v. Sec'y of Labor*, 200 F.3d 564, 568 (8th Cir. 2000) (observing that, in light of an agency decision's inadequacy, "we cannot assess the correctness of the ALJ's apparent determination that a [regulatory] violation occurred, nor can we evaluate the ALJ's characterization of the violation as willful"); *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1407 (D.C. Cir. 1995) ("Because the [agency] only listed the facts and stated its conclusions, but did not

-18-

connect them in any rational way, the [agency's] decisions are arbitrary and capricious. Where an agency has failed . . . to explain the path it has taken, we have no choice but to remand for a reasoned explanation." (citation, internal quotation marks, and footnote omitted)). Of course, "[t]his duty of explanation is not intended to be a mandate for administrative verbosity or pedantry. If a reviewing court can discern what the ALJ did and why he did it, the duty of explanation is satisfied." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1999) (internal quotation marks omitted).

This duty of explanation has added importance for cases in which medical or scientific evidence has been presented. "[A] scientific dispute must be resolved on scientific grounds. This requires the ALJ to articulate a reason and provide support for favoring one opinion over another." *Stalcup*, 477 F.3d at 484 (internal quotation marks and citation omitted); *see also Freeman United Coal Mining Co. v. Benefits Review Bd., U.S. Dept. of Labor,* 879 F.2d 245, 248 (7th Cir. 1989) (stating that "[c]oncomitant with the ALJ's duty to resolve all conflicts in the medical evidence is the responsibility to provide some general articulable basis for rejecting certain key medical evidence that favors or disfavors an award of benefits"). As Judge Posner has written, that obligation comports with "the elementary principles of rational truth-seeking." *Sahara Coal Co. v. Fitts*, 39 F.3d 781, 782 (7th Cir. 1994). It also accords with the deference courts generally afford to agency action that "implicates scientific and technical judgments within the scope of agency expertise."

-19-

*See Wyoming v. United States*, 279 F.3d 1214, 1240 (10th Cir. 2002) (internal quotation marks omitted). That expertise allows agencies to relax the rules of evidence because they are deemed to "have the skill needed to handle evidence that might mislead a jury. They have a corresponding obligation to *use* that skill when evaluating technical evidence." *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001) (citation omitted).

There are a variety of ways in which an agency decision may fail to meet the obligation to resolve a scientific dispute on scientific grounds. For example, it may wrongly attempt to avoid the scientific controversy altogether "by basing [its] decision on which side has more medical opinions in its favor." *Stalcup*, 477 F.3d at 484. Alternatively, the agency may erroneously decide the case on a theory of reliability that has no scientific basis. *See Peabody Coal*, 255 F.3d at 468 (concluding that an ALJ could not base his decision on the mere fact that one expert had performed the autopsy while others with conflicting opinions had examined tissue slides because there was no "medical reason to believe that visual scrutiny of gross attributes is more reliable than microscopic examination of tissue samples as a way to diagnose pneumoconiosis"). In other instances, the agency decisionmaker may err by providing only a cursory statement that one expert's opinion outweighs another, thereby leaving a reviewing court "unable to determine the analytic process behind the result." *Barren Creek*, 111 F.3d at 354; *see also Milburn Colliery Co. v. Hicks,* 138 F.3d 524, 536 (4th Cir. 1998) (holding that an ALJ failed to comply with

5 U.S.C. § 557(c)(3)(A) when he "relied upon summary conclusions that were not fully explained or supported").

## 2. Application of § 557(c)(3)(A) in Black Lung Benefits Act cases

Our sister circuits have applied these precepts in a number of black lung cases, remanding for further proceedings when the agency has failed to adequately explain its assessment of disputed medical and scientific evidence regarding the causes of a miner's pulmonary disease. For example, in *Stalcup*, the ALJ stated that "[three physicians] found no pneumoconiosis, while [two other physicians] found the existence of the disease" and then explained that "[b]ecause these opinions are entitled to equal weight, I now find that [the miner] has not established the existence of pneumoconiosis." 477 F.3d at 484. In remanding, the Seventh Circuit held that the ALJ had impermissibly merely "counted noses" and had erred by "dodg[ing] the scientific controversy by counting the reliable physicians on each side." *Id.* Because the ALJ had failed to "indicate why the opinions of [the doctors finding no pneumoconiosis] are more persuasive than the contrary opinions[,]" he failed to satisfy his § 557(c)(3)(A) obligation and a remand was warranted.

Similarly, in *Barren Creek*, the Third Circuit remanded a black lung case to the agency because the ALJ had "provid[ed] virtually no explanation for his acceptance of some opinions and his rejection of others." 111 F.3d at 355. The court observed that "the APA demands a substantially longer and more explanatory discussion on the part of the ALJ for the basis of his decision and the rejection of

-21-

substantial probative evidence to the contrary" and that "[g]iven the amount and variety of medical information in the record, the one paragraph which the ALJ devotes to explaining his choices among the evidence is completely inadequate." *Id.* at 355, 356.

Finally, in *Milburn Colliery*, the Fourth Circuit found a similar deficiency in an ALJ's order that merely stated that "[b]ased upon the totality of the evidence, in particular the opinion of [a particular doctor], which I credit, I find that the Claimant's coal worker's [sic] pneumoconiosis clearly is, at least, a significant contributing cause of such total disability." 138 F.3d at 536 (first and last alteration in original). In the court's view, that conclusion was not supported with the "valid reasoning" required under the APA. *Id.* at 537; *see also Sahara Coal*, 39 F.3d at 783 (remanding a black lung case to the agency because "[n]othing in the administrative law judge's opinion offers a clue as to how to choose between the two physicians' opinions"). These cases are persuasive, and they guide our analysis here.

### 3. The ALJ's decision in Mr. Gunderson's case

Like the courts in *Stalcup*, *Barren Creek*, *Milburn Colliery*, and *Sahara Coal*, we cannot discern "the reasons or basis," 5 U.S.C. § 557(c)(3)(A), for the ALJ's rejection of Mr. Gunderson's claim that he suffered from legal pneumoconiosis. The ALJ failed to resolve the "scientific dispute . . . on scientific grounds." *Stalcup,* 477 F.3d at 484 (internal quotation marks omitted).

In particular, from the ALJ's statement that the conflicting opinions are "evenly balanced, and should receive equal weight," Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22, we cannot tell how he evaluated their opinions. The mere fact that equally qualified experts gave conflicting testimony does not authorize the ALJ to avoid the scientific controversy by declaring a tie. *See Stalcup*, 477 F.3d at 484 ("[W]hen an ALJ is faced with conflicting evidence from medical experts, he cannot avoid the scientific controversy by basing his decision on which side has more medical opinions in his favor."). Of course, there may be some issues as to which scientific knowledge does not permit an ALJ to identify the more probable of the disputed expert opinions. However, if that is the case, then ALJ has a duty to explain, on scientific grounds, why a conclusion cannot be reached. *Stalcup*, 477 F.3d at 484. Merely stating that the evidence is "evenly balanced, and should receive equal weight," without further explanation, is not sufficient. *See* Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22.

In reaching this conclusion, we reject Blue Mountain Energy's contention that requiring a more detailed, scientifically-grounded explanation from the ALJ sets the bar too high. *See* Aple's Br. at 34 (stating that "Gunderson's argument that the ALJ somehow is required to resolve perceived conflicts in medical literature in the course of resolving the factual disputes in the case and then relate the clinical evidence to the articles is an extraordinary demand supported by no authority"). The ALJ's task is not to resolve general scientific controversies, but instead to determine the facts of

-23-

the case at hand and apply the law accordingly. This is a task that is routinely assigned to judges and to juries and that may be accomplished by careful consideration of many factors, including "the qualifications of the respective physicians, the explanation of their medical opinions, the documentation underlying their medical judgments, and the sophistication and bases of their diagnoses." *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 441 (4th Cir. 1997); *cf. Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 917 (10th Cir. 2005) (concluding that a jury was capable of evaluating "extensive expert testimony on the scientific and medical literature describing the relationship between smoking and peripheral vascular disease" in determining whether the defendant had a duty to warn of those risks); *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1236 (10th Cir. 2004) (concluding that a jury was capable of evaluating expert testimony regarding "whether copper sulfide particles found on the valve seat in this case were sufficient to cause a leak").

Moreover, with regard to disputes concerning the existence and causes of pneumoconiosis, an ALJ has the benefit of a substantial inquiry by the Department of Labor. For example, the Department's regulations characterize pneumoconiosis "as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure." 20 C.F.R. § 718.201(c). An ALJ may properly rely on those regulations when assessing scientific testimony. *See Roberts & Schaefer Co. v. Dir., Office of Workers' Comp. Programs*, 400 F.3d 992, 999 (7th

Cir. 2005) (concluding that an ALJ could properly limit the weight assigned to an expert opinion because the opinion "conflict[ed] with [20 C.F.R.] § 718.201(c)'s recognition that pneumoconiosis can be latent and progressive" and was "contrary to the congressional findings and purpose central to the BLBA"); *Midland Coal Co. v. Dir., Office of Workers' Comp. Programs*, 358 F.3d 486, 490 (7th Cir. 2004) (holding that an ALJ could properly rely on the Department's finding on the scientific question whether legal pneumoconiosis is "a disease that can be latent and progressive").

We further note that, although there are certainly instances in which agency tribunals have failed to provide a reasoned explanation in black lung cases, there are also a number of reported decisions, thankfully, in which ALJs have complied with the APA standard, even when closely disputed scientific testimony is involved. For example, in *Consolidation Coal Co. v. Dir., Office of Workers' Comp. Programs*, 521 F.3d 723 (7th Cir. 2008), the ALJ heard conflicting evidence from two of the same experts who testified in Mr. Gunderson's case: Drs. Cohen and Renn. Instead of concluding, as the ALJ did here, that the experts' testimony was "evenly balanced, and should receive equal weight," Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22, the ALJ in *Consolidation Coal* offered an explanation as to *why* Dr. Cohen had the better view: "The ALJ found Dr. Cohen's opinion most persuasive because he carefully discussed the substantial body of scientific evidence documenting the causal relationship between [chronic obstructive pulmonary disease] and occupational exposure . . . . Dr. Cohen integrated this medical evidence along

-25-

with [the miner's] medical record to conclude that coal dust exposure did contribute to his obstruction." 521 F.3d at 726. *See also Consolidation Coal Co. v. Dir., Office of Workers' Comp. Programs*, 294 F.3d 885, 889 (7th Cir. 2002) (affirming an ALJ's explicit finding that an expert's "negative reading of the CT scan was unreliable, for the judge was of the opinion that the record failed to establish that [the expert] ha[d] sufficient knowledge, training, or expertise in reading and interpreting a CT scan for the diagnosis of legal pneumoconiosis"); *Freeman United Coal Min. Co. v. Summers*, 272 F.3d 473, 483 (7th Cir. 2001) (concluding that an ALJ could properly credit the testimony of one expert over others because of that expert's "remarkable clinical experience and superior knowledge of cutting-edge research"); *Peabody Coal Co. v. Hill*, 123 F.3d 412, 417 (6th Cir. 1997) (concluding that the ALJ's explanation was sufficient when he offered specific reasons for crediting and discounting the testimony of physicians regarding the existence of pneumoconiosis, including (a) the fact that the mining company's experts did not "persuasively discount[] the effects of [the miner's] thirty-seven years of underground employment in rejecting the impact of coal dust exposure in their analysis of the cause of [the miner's] disability" and "offered no detailed analysis to support ruling out coal mine employment as the cause of [the miner's] respiratory condition[;]" (b) that the opinions of some experts "did not take into account [the miner's] smoking history[;]" (c) that another expert's opinion "accounted both for coal dust exposure and smoking history in diagnosing pneumoconiosis," and was thus the most credible; and (d) that the experts whom the

-26-

ALJ found credible based their opinions "on many factors that included and extended beyond the x-ray reports").

### 4. *Greenwich Collieries*

In rejecting Mr. Gunderson's challenge to the sufficiency of the ALJ's explanation, the Benefits Review Board cited the Supreme Court's decision in *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). There, the Court construed § 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d), which imposes the "burden of proof" on the proponent of an order. The Court held that the phrase should be understood as having its "ordinary or natural meaning," which, it said, was the burden of persuasion. 512 U.S. at 272. The Court struck down a Labor Department rule (the so-called "true doubt" rule), which imposed the burden of persuasion on the party opposing a claim for benefits. As the Court explained it: "Under the Department's true doubt rule, when the evidence is evenly balanced the claimant wins. Under § 7(c) [of the Administrative Procedures Act], however, when the evidence is evenly balanced, the benefits claimant must lose." 512 U.S. at 282. Under *Greenwich Collieries*, the APA provision controls.

In our view, *Greenwich Collieries* does not cure the ALJ's order of its deficient explanation. The Supreme Court's decision does not address the dispositive issue here—whether the ALJ's decision was sufficiently reasoned and explained, as required by 5 U.S.C. § 557(c)(3)(A). To be sure, there may be cases in which the scientific evidence is evenly balanced. Under *Greenwich Collieries*, the benefits

claimant could not prevail in such a case.  However, from the ALJ's cursory assessment here, we cannot conclude that Mr. Gunderson's is such a case.

### 5.  Remand is required

We therefore conclude that the ALJ had failed provide a sufficient explanation of his decision denying Mr. Gunderson's claim for benefits, as required by 5 U.S.C. § 557(c)(3)(A).  Accordingly we must remand the case to the Department of Labor for further proceedings.[4]

**C.  The ALJ did not err in excluding a letter from the Director of the Division of Respiratory Disease Studies at the National Institute of Occupational Health and Safety reporting that an x-ray was positive for pneumoconiosis.**

Finally, Mr. Gunderson argues that the ALJ erred in excluding a January 2001 letter from Dr. Gregory Wagner, Director of the Division of Respiratory Disease

---

[4]    Mr. Gunderson also argues that the ALJ "[f]ailed to [c]ompare the [c]redentials of the [e]xperts [i]n an [e]ven-[h]anded [w]ay." Aplt's Br. at 41.  He contends that, with regard to the physicians who read the x-rays, the ALJ gave greater weight to the one with the most experience (Dr. Wiot).  However, Mr. Gunderson contends, as to the doctors who examined him and reviewed his other medical records, the ALJ failed to give more weight to the more experienced ones (*i.e.*, those who concluded that he had pneumoconiosis).

We are not persuaded by Mr. Gunderson's argument.  The ALJ had discretion to make particular credibility findings as to x-ray readers and different findings as to other doctors. *See Energy West,* 555 F.3d at 1217 (stating that "[w]e are especially mindful that the task of weighing conflicting medical evidence is within the sole province of the ALJ and that where medical professionals are in disagreement, the trier of fact is in a unique position to determine credibility and weigh the evidence") (internal quotation marks and citation omitted).  Moreover, the ALJ's credibility findings need not be based solely on the kinds of measures that Mr. Gunderson suggests (*e.g.*, that his testifying physicians were more credible because they were seeing more patients).

-28-

Studies at the National Institute of Occupational Safety and Health. In the letter, Dr. Wagner reports that on August 25, 2000, at Rangely District Hospital, Mr. Gunderson had a chest x-ray that detected evidence of pneumoconiosis.

At the evidentiary hearing, the ALJ initially admitted the Wagner letter. However, in his written ruling, the ALJ excluded the letter, reasoning that (1) the letter exceeded the two x-ray limit of 20 C.F.R. § 725.414(a) and (2) in any event, the letter did not meet the standards for x-rays set forth in 20 C.F.R. § 718.202(a) and § 718.102 because (a) it did not show the date the x-ray was taken and (b) it did not give the name or qualifications of the doctor who read the x-ray or the type of opacities found.

Mr. Gunderson now contends that the decision to exclude the Wagner letter was error. He argues that, notwithstanding the two-x-ray limit, the letter may be properly considered as a "treatment record" under 20 C.F.R. § 725.414(a)(4). That regulation states that "any record of a miner's . . . medical treatment for a respiratory or pulmonary or related disease, may be received into evidence." *Id.*

We discern no grounds for reversal here. The governing Administrative Procedures Act provision states that "[a]ny oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d). Because the Wagner letter only referred to an x-ray but did not contain crucial information

about it (*e.g.*, who interpreted it and what it actually showed), the ALJ did not abuse his considerable discretion in excluding the letter.

Moreover, as we have noted, the APA also provides that courts reviewing agency decisions shall take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. In light of the quantity of detailed evidence of Mr. Gunderson's medical history already in the record, he has failed to show that the exclusion of this one letter has caused him prejudice.

### III. CONCLUSION

The ALJ did not offer a scientific explanation for his conclusion that the experts' testimony was "evenly balanced, and should receive equal weight," and that, as result, Mr. Gunderson had failed to establish that he suffered from legal pneumoconiosis. *See* Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22. In this regard, the ALJ's decision did not comply with the governing provision of the Administrative Procedures Act, 5 U.S.C. § 557(c)(3)(A). Although we reject Mr. Gunderson's other challenge to the ALJ's ruling, we must therefore REMAND the case to the Department of Labor for further proceedings consistent with this opinion.

08-9537 *Gunderson v. U.S. Dep't of Labor*

**O'BRIEN**, J., Dissenting.

Even though intimately familiar with the issues and knowledgeable as to the scientific principles presented in a case, an administrative law judge (ALJ) is not an expert. The ALJ is not expected, nor permitted, to meld expert opinion into his own unified theory, which he then independently applies to the facts. And it is beyond the ken of an ALJ to resolve a scientific debate. Instead, once the ALJ determines "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand,"[1] the only issue is credibility. When expert opinion is diametrically opposed, the ALJ must, based on all of the evidence, make a reasoned choice, if possible, as to which expert opinion is more probably correct. But a principled choice cannot always be achieved. As the majority concedes "there may be cases in which the scientific evidence is evenly balanced." (Majority Op. at 29.) This is such a case. When he could do so, the ALJ made credibility choices among the experts; when he could not, he candidly confessed his inability. Accordingly, I must dissent from the majority's requirement that the ALJ do more than explain why expert opinion is in equipoise and hold the proponent of an issue to his burden of proof.

The Administrative Procedure Act provides in pertinent part:

The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—[ ] findings and conclusions, and the reasons or basis

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

therefor, on all the material issues of fact, law, or discretion presented on the record . . . .

5 U.S.C. § 557(c). As explained by the Supreme Court, the APA "establishes a scheme of reasoned decisionmaking. Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (citation and quotations omitted). The purpose of the APA's "duty of explanation" is twofold—it "help[s] the ALJ get it right" and it "allow[s] [the appellate court] to discharge [its] duty to review the decision." *Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs*, *United States Dep't of Labor*, 137 F.3d 799, 803 (4th Cir. 1998) (citation omitted).

Here, doctors on both sides agreed Gunderson had legal pneumoconiosis but they disagreed as to the cause. Gunderson's experts, Dr. Cohen and Dr. Parker, opined Gunderson's pneumoconiosis was caused by both coal dust and smoking.[2] Blue Mountain's experts, Dr. Rephser and Dr. Renn, opined Gunderson's pneumoconiosis was not caused by coal dust. The ALJ did not resolve the scientific dispute as to the causation of Gunderson's pneumoconiosis on scientific

---

[2] Dr. Shockey, who examined Gunderson for the Department of Labor, also concluded Gunderson suffered from pneumoconiosis attributable in part to coal dust. Dr. Shockey is neither board-certified nor a B-reader so the ALJ did not give his opinion as much weight as that of the other, better credentialed, doctors. The ALJ then decided Gunderson did not have <u>clinical</u> pneumoconiosis; Gunderson has not appealed from that decision. The ALJ concluded the expert opinion was equally divided on the <u>legal</u> pneumoconiosis issue.

grounds for good reason. Because all the experts were equally well-qualified and gave a reasoned basis for their conflicting conclusions, the ALJ—who presumably is not board-certified, or even schooled, in the medical arts—had no basis for determining which doctor was correct, only who was more credible.

The majority relies, in part, on two cases from the Seventh Circuit, *Stalcup v. Peabody Coal Co.*, 477 F.3d 482 (7th Cir. 2007), and *Sahara Coal Co. v. Fitts*, 39 F.3d 781 (7th Cir. 1994). In *Sahara*, two physicians, Drs. Raos and Houser, concluded the claimant had pneumoconiosis while one doctor, Dr. Tuteur, concluded he did not. The ALJ determined the claimant had the disease and awarded him benefits, simply saying: "While Dr. Tuteur's report is both adequately documented and well reasoned, his opinion is outweighed by the opinions of Drs. Rao and Houser, despite the subsequent negative x-ray interpretations." 39 F.3d at 782 (quotations omitted). The Seventh Circuit reversed and remanded, surmising the ALJ's result was actually based on the number of opinions rather than their substance. *Id.* In *Stalcup*, the Court further expounded:

> [W]hen an ALJ is faced with conflicting evidence from medical experts, he cannot avoid the scientific controversy by basing his decision on which side has more medical opinions in its favor. This unreasoned approach, which amounts to nothing more than a mechanical nose count of witnesses, would promote a quantity-over-quality approach to expert retention, requiring parties to engage in a race to hire experts to insure victory.

477 F.3d at 484 (citations and quotations omitted). There, the court remanded the case to the ALJ because the ALJ arrived at its decision by "count[ing] noses." *Id.* It explained: "[The ALJ] concluded the qualifications and expertise of the physicians are equal and then dodged the scientific controversy by counting the reliable physicians on each side." *Id.*

Gunderson asserts: "[The ALJ's] assignment of 'equal weight' to conflicting opinions that he found to be each equally well-reasoned and documented, is no different than the mechanical nose-counting that the courts have uniformly deplored." (Appellant's Reply Br. at 15.) But being unable to resolve a credibility issue on principled grounds is a far cry from merely counting noses. Here, after discussing the opinions and credentials of the experts, the ALJ stated the medical evidence and opinions before him were in equipoise and, therefore, Gunderson failed to meet his burden of proof. I do not read *Sahara* and *Stalcup* to require the ALJ to definitively pronounce the science on one side to be preferable to the science on the other. Rather, these holdings require a careful review of the substance, not the number, of the medical opinions. From this review, the ALJ must ultimately determine whether the party bearing the burden of proof has shown his opinions are more likely to be correct. No more is required.

The majority also relies on cases from the Third and Fourth Circuits. In *Barren Creek Coal Co. v. Witmer*, the Third Circuit held the ALJ violated the APA

-4-

by providing a "completely inadequate" one paragraph explanation for his conclusion the claimant was totally disabled:

> The ALJ provides virtually no explanation for his acceptance of some opinions and his rejection of others.  Even a brief look at the credentials of each doctor, and at the circumstances under which each formed his opinion, demonstrates that the APA demands a substantially longer and more explanatory discussion on the part of the ALJ for the basis of his decision and the rejection of substantial probative evidence to the contrary.

111 F.3d 352, 355 (3d Cir. 1997).

In *Milburn Colliery Co. v. Hicks*, the Fourth Circuit reversed and remanded the ALJ's determination in favor of the claimant because "the ALJ erred by failing to consider all of the relevant evidence, improperly weighing certain evidence, failing to adequately explain why he credited certain evidence and discredited other evidence, and never adequately addressing the evidence of Hicks' other health problems."  138 F.3d 524, 532 (4th Cir. 1998).

Neither *Barren Creek Coal* nor *Milburn* provides much guidance.  Here, the ALJ carefully avoided any impermissible presumptions and thoroughly evaluated the relevant evidence.  Contrary to the majority's description of the ALJ's discussion as "cursory," the decision sets forth the doctors' qualifications, describes the medical opinions in detail and notes the documentation underlying their disagreements and contrary conclusions.[3]  (Majority Op. at 4, 29.)  In the end, the ALJ concluded the opinions were equally well-reasoned and equally

---

[3] The ALJ's decision is attached as Exhibit A.

supported by the literature.  As the Fourth Circuit has explained: "If we understand

what the ALJ did and why he did it, we, and the APA, are satisfied." *Lane Hollow*

*Coal Co.*, 137 F.3d at 803.  It seems to me the majority's approach sacrifices

candor on the altar of regularity.

Decisions of the Department of Labor's Benefits Review Board provide that

"B readers"[4] are generally to be considered more credible (because of

demonstrated proficiency) than other x-ray readers,[5] a presumption the ALJ

employed here in discounting the opinion of Dr. Shockey.  Of course that would

not always be true, but an ALJ might be called upon to explain why the

presumption was overcome in a specific instance.  On the other hand, an ALJ

would not generally be expected to explain why he gave more weight to the

opinion of a "B reader" (because most often it would be an unnecessarily time

consuming endeavor).  So—if he has a mind to do so, an ALJ unwilling to commit

---

[4] 20 C.F.R. § 718.202(a)(1)(ii)(E) defines a "Certified 'B' reader or 'B'
reader" as:

> a physician who has demonstrated proficiency in evaluating chest
> roentgenograms for roentgenographic quality and in the use of the
> ILO-U/C classification for interpreting chest roentgenograms for
> pneumoconiosis and other diseases by taking and passing a specially
> designed proficiency examination given on behalf of or by the
> Appalachian Laboratory for Occupational Safety and Health.  See 42
> CFR 37.51(b)(2).

[5] *But see Black & Decker Disability Plan  v. Nord*, 538 U.S. 822, 830
(2003) (recognizing that affording more weight to a treating physician's opinions
than those of a retained consultant may make "scant sense" when the relationship
between the treating physician and the claimant is of short duration or the
retained consultant has expertise the treating physician lacks).

sufficient effort to the analytical process, can find a presumption or distinction sufficient to survive review, given the deferential standards employed. Accepting a candid assessment of credibility such as the one made here is more likely to yield just results than requiring explanations and justifications, which in the end may be hollow. Moreover, it reflects the trust and confidence we <u>supposedly</u> have in the integrity and competence of ALJs. Here, were it his purpose, the ALJ could have found a reason to prefer Blue Mountain's experts over Gunderson's. Had he done so, it is unlikely his decision would be reversed.

"[E]ach miner bear[s] the burden of proving that his obstructive lung disease did in fact arise out of his coal mine employment, and not from another source." 65 Fed. Reg. 79,920, 79,938 (Dec. 20, 2000); *see also* 64 Fed. Reg. 54,966, 54,978 (Oct. 8, 1999) (noting that if a miner fails to demonstrate the existence of clinical pneumoconiosis "he must prove that his lung disease arose out of coal mine employment in order to carry his burden and establish that he has pneumoconiosis"). I see no basis for Gunderson's claim that his experts merit more weight. The weight afforded to experts is a credibility determination to which we defer to the ALJ. *See Hansen v. Dir., Workers' Comp. Programs, United States Dep't of Labor*, 984 F.2d 364, 370 (10th Cir. 1993) ("The evidence was conflicting and, where medical professionals are in disagreement, the trier of fact is in a unique position to determine credibility and weigh the evidence."). Surely, the ALJ does not violate the APA by failing to resolve a true scientific

dispute.  That is why a claimant is required to meet his burden of persuasion; where the evidence is in equipoise, he has not done so.  I would affirm the ALJ's reasoned decision, as affirmed by the Department of Labor's Benefits Review Board,[6] that Gunderson is not entitled to benefits because his evidence was insufficient.

---

[6] The Board's decision is attached as Exhibit B.

# EXHIBIT A

**U.S Department of Labor**  Office of Administrative Law Judges
11870 Merchants Walk Suite 204
Newport News, VA 23606-1904

757-591-5140
757-591-5150 (FAX)



SUBJECT: **TG v. BLUE MOUNTAIN ENERGY, INC.**
           Case No. 2004BLA05323

<

The attached document uses the initials "TG" to represent the Claimant's
name,"GUNDERSON TERRY O. ".

**OALJ Case Docket Information**
Case Document: 2004BLA05323 Case Decision
Title: Decision and Order - Denying Benefits
Claimant: Initials "TG" = "GUNDERSON TERRY O. "
Employer: BLUE MOUNTAIN ENERGY, INC.

A 1



**U.S. Department of Labor**     Office of Administrative Law Judges
11870 Merchants Walk - Suite 204
Newport News, VA 23606

(757) 591-5140
(757) 591-5150 (FAX)

**Issue Date: 21 March 2007**

Case No.:         **2004-BLA-05323**

In the Matter of:

**T. G.,**
                    Claimant,
        v.

**BLUE MOUNTAIN ENERGY,**
                    Employer
        and

**OLD REPUBLIC INSURANCE COMPANY, INC.**
                    Carrier,
        and

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,**
                    Party-in-Interest.

Appearances:   Thomas E. Johnson, Esq.
                        For the Claimant

                        Richard H. Risse, Esq.
                        For the Employer

Before:        RICHARD K. MALAMPHY
                        Administrative Law Judge

### DECISION AND ORDER - DENYING BENEFITS

This case arises from a claim for federal benefits under the "Black Lung Benefits Act," Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 901 et seq. ("ACT"), and applicable regulations, mainly 20 C.F.R. Parts 410, 718 and 727 ("Regulations").

The Act and Regulations provide compensation and other benefits to: (1) living coal miners who are totally disabled due to pneumoconiosis and their dependents; (2) surviving dependents of coal miners whose death was due to pneumoconiosis; and (3) surviving dependents of coal miners who were totally disabled due to pneumoconiosis at the time of their death (for claims filed prior to January 1, 1982). See also Sections 718.306 and 727.204 for

A 2

entitlement presumptions in certain death claims filed before April 30, 1982, where the miner was partially disabled at death. Other benefits include necessary medical and hospitalization costs required for the treatment of pneumoconiosis. The Act and Regulations define pneumoconiosis ("black lung disease" or "CWP") as a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. See § 718.201.

A formal hearing was held in Grand Junction, Colorado on May 18, 2006, at which all parties were afforded a full opportunity to present evidence and argument, as provided in the Act and the Regulations issued thereunder, found in Title 20, Code of Federal Regulations, Parts 725 and 718.

## ISSUES

The contested issues are:

1.  Whether the Claimant has pneumoconiosis;

2.  Whether the Claimant's pneumoconiosis arose out of his coal mine employment;

3.  Whether the Claimant is totally disabled; and

4.  Whether the Claimant's total disability is due to pneumoconiosis. (DX 31)[1]

## PRELIMINARY MATTERS

The District Director, in a Proposed Decision and Order dated February 6, 2003, concluded that the Miner was totally disabled due to coal workers' pneumoconiosis. (DX 29) The putative responsible operator rejected the Proposed Decision and Order and requested a formal hearing before an administrative law judge. (DX 30)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Coal Miner

The Claimant was a coal miner within the meaning of § 402(d) of the Act and § 725.202 of the Regulations for at least thirty years. (See Stipulation of Parties at TR 16)

---

[1] The following abbreviations have been used as citations to the record:

|  |  |  |
|---|---|---|
| ALJX | - | Administrative Law Judge's Exhibits; |
| CX | - | Claimant's Exhibits; |
| EX | - | Employer's Exhibits; |
| DX | - | Director's Exhibits; and |
| TR | - | Transcript of Hearing. |

A 3

Date of Filing

The Claimant filed his claim for benefits under the Act on June 15, 2001. (DX 2). None of the Act's filing time limitations are applicable, thus the claim was timely filed.

Responsible Operator

Blue Mountain Energy is the last Employer for whom the Claimant worked a cumulative period of at least one year and is the properly designated responsible coal mine operator in this case under Subpart F of Part 725 of the Regulations. (See Stipulation at TR 16).

Dependent

The Claimant has one dependent for purposes of augmentation of benefits under the Act, his wife. (DX 2, TR 22).

## Background and Employment History

The Claimant

At the hearing, the Claimant testified that he retired on January 7, 2004. (TR 22) He stated that by the time he retired he was less capable of performing his job. (TR 44) He was unable to "keep up" because of fatigue. (TR 44)

At the time of his retirement, the Claimant was employed as an acting general foreman. (TR 41-43) Prior to working as an acting general foreman, he was a shift foreman for approximately thirteen years. (TR 30, 41) Before becoming a shift foreman, he held a variety of other mining jobs. (TR 22-30)

As a shift foreman, the Claimant was required to supervise numerous workers and complete some paperwork. (TR 30, 51) However, the job also required rigorous physical activity. (TR 34-41) The Claimant often helped stack timbers or concrete blocks to reinforce the mine's roof, using materials that weighed between 30 and 150 pounds. (TR 34-35) He was also required to carry bags of rock dust weighing fifty pounds and shovel coal that fell off of the belt lines. (TR 37-38) Further, on an average day he walked between ten and fifteen miles. (TR 40)

The Claimant admitted that after becoming the acting general foreman, his workload probably lessened. (TR 52) He performed the same physically demanding tasks as the acting general foreman that he did as a shift foreman. (TR 53) He just did not always have to perform the tasks as often. (TR 53)

The dust level in this mine, a mine which produced as much as two million tons of coal in one year, and as much as 2,500 tons of coal in one hour, was significant. (TR 31-34) The Claimant stated that, when the miners were cutting the entries or when the machines were digging into the coal, a substantial amount of dust was being generated. (TR 32) Further, in

some areas, where used air was brought out of the mine, dust from the active production areas was also being expelled. (TR 33-34) At these areas, where the Claimant often worked, the dust level was very high. (TR 34) The Claimant stated that "[c]oal mining is dusty business. If you're not eating coal dust, you're blowing rock dust." (TR 34)

The Claimant acknowledged that he smoked cigarettes from 1962 to 1996 at a rate of about one pack per day. (TR 47) He occasionally smoked a pipe, although he did not inhale. (TR 48-49, 60)

The Claimant now experiences significant shortness of breath. (TR 46). He has difficulty carrying things or doing other manual labor, such as digging holes in his yard. (TR 46) When performing such tasks, he has to sit down and rest. (TR 46) He stated, "I just don't have the stamina. Seems like I wear out easy." (TR 46)

Dr. Lawrence Repsher

Dr. Lawrence Repsher testified at the hearing that he is an internist and that he specializes in pulmonary diseases. (TR 62) He is also a B-Reader. (TR 63) Further, he is certified as an examiner for the Colorado Workers' Compensation Board. (TR 63)

Dr. Repsher stated that he examined the Claimant in September of 2002. (TR 63) During that examination, the Claimant underwent a chest x-ray. (TR 64) Dr. Repsher found no evidence of pneumoconiosis on the x-ray. (TR 64) He did determine that the Claimant had some intrinsic lung disease, with mild obstruction, and probably some emphysema, but did not believe that any of these conditions were caused by the Claimant's coal mine work, or that any of these conditions would prevent the Claimant from returning to his prior coal mine employment. (TR 96). Dr. Repsher stated that the Claimant's mild obstructive breathing impairment was due solely to cigarette smoke. (TR 101)

Dr. Repsher noted that he reviewed a report by Dr. Robert Cohen dated April 26, 2006, which included information on an exercise study that was performed by Dr. Cohen in June of 2005. (TR 65-66) The Claimant was able to exercise for almost eleven minutes at that time. (TR 89) According to the results of that exercise study, the Claimant reached his anaerobic threshold. (TR 79) Dr. Repsher stated that this was significant because it meant that the Miner was not limited by lung capacity. (TR 79).

Dr. Repsher disagreed with some of the conclusions that Dr. Cohen drew from the exercise study. (TR 94-95) Dr. Cohen found that the Claimant had a significant gas exchange limitation to exercise. (TR 94) Dr. Repsher, in contrast, did not believe that the Claimant's gas exchange abnormalities limited his exercise "because his exercise wasn't limited [by his lungs]." (TR 95)

Dr. Repsher acknowledged that the results of several arterial blood gas studies were qualifying under the Department of Labor's standards for total disability. (TR 116) When asked how he could find that the Claimant was not totally disabled, given the qualifying arterial blood gas tests, Dr. Repsher stated that the qualifying arterial blood gas tests were enough to "establish

- 4 -

A 5

the presumption of total disability, but that this was a "rebuttable presumption." (TR 116-117) Dr. Repsher also stated that arterial blood gas studies were a "very crude and often inaccurate way of assessing a person's exercise capacity." (TR 69) Since the results of the exercise test, a much more sophisticated test, showed that the Claimant's ability to exercise or work was not limited by lung disease, the presumption established by the arterial blood gas tests was rebutted. (TR 122)

### Pneumoconiosis and Total Disability

The Claimant's application for benefits was filed with the Department of Labor on June 15, 2001 and thus is governed by the permanent Regulations found in 20 C.F.R. § 718, which became effective on March 31, 1980. Under the new Regulations, the Claimant must establish the existence of pneumoconiosis, that he is totally disabled as a result of the disease, and that the disease arose from coal mine employment. Failure to establish any one of these elements precludes entitlement. Perry v. Director, OWCP, 9 B.L.R. 1-1, 1-2 (1986).

Pneumoconiosis

Section 718.202 provides that the existence of pneumoconiosis can be established by x-ray, autopsy or biopsy, or by the report of a physician exercising sound medical judgment stating the Claimant suffers from pneumoconiosis. 20 C.F.R. § 718.202 (2003).

*X-Ray Reports:*

| Number | Date of X-Ray | Date of Report | Physician/ Qualifications[2] | Diagnosis |
|---|---|---|---|---|
| EX 7, EX 8[3] | 4/28/89 | 5/2/89 | Smith, --- | Non specific interstitial lung disease |
| EX 7, EX 8 | 10/8/94 | 10/8/94 | Smith, --- | " |
| EX 7, EX 8 | 8/16/96 | 8/19/96 | Kulwiec, --- | " |
| EX 7, EX 8, EX 9 | 6/26/97 | 6/26/97 | Smith, --- | " |
| EX 7, EX 8, EX 9 | 7/10/97 | 7/10/97 | Kulwiec, --- | Improving atelectasis and/or infiltrate |
| EX 7, EX 8 | 7/12/97 | 9/18/97 | Smith, --- | Non specific interstitial lung disease |

---

[2] The following abbreviations will be used in describing the qualifications of the physicians:
      BCR – Board-certified radiologist;
       B – B-reader;
       A – A-reader; and
       --- – Reader's qualifications unknown, not part of the record.

[3] The x-rays listed in EX 9, EX, 8, EX 7 and EX 6 are admissible as treatment records.

A 6

| | | | | |
|---|---|---|---|---|
| EX 7, EX 8 | 7/18/97 | 7/24/97 | Nystrom, --- | Non specific interstitial lung disease |
| EX 7, EX 8 | 1/28/98 | 2/2/98 | Kulwiec, --- | Right lower lobe infiltrate, emphysema |
| EX 6, EX 8 | 2/9/98 | 2/9/98 | Smith, --- | Emphysema |
| EX 7, EX 6, EX 8 | 8/10/98 | 9/21/98 | Kulwiec, --- | Emphysema |
| EX 7, EX 6, EX 8 | 8/25/00 | 8/28/00 | Nystrom, --- | Non specific interstitial lung disease |
| EX 6[4] | 9/7/01 | 9/7/01 | Bechtel, --- | Subtle nodularity suggesting CWP |
| DX 16 | 4/4/02 | 4/4/02 | Shockey | 1/1 |
| DX 20 | 4/4/02 | 7/24/02 | Wiot, BCR, B | No CWP |
| CX 1 | 4/4/02 | 4/13/06 | Cappiello, BCR, B | 1/0 |
| DX 23, EX 2 | 9/9/02 | 9/9/02 | Repsher, B | 0/0 |
| DX 21 | 9/9/02 | 9/24/02 | Wiot, BCR, B | No CWP |
| CX 7 | 9/9/02 | 5/4/06 | Ahmed, BCR, B | 1/1 |
| CX 11 | 9/9/02 | 6/7/06 | Cappiello, BCR, B | 1/0 |
| CX 2 | 6/14/05 | 4/13/06 | Cappiello, BCR, B | 1/0 |
| EX 12 | 6/14/05 | 5/10/06 | Wiot, BCR, B | No CWP |
| CX 3 | 3/22/06 | 4/13/06 | Cappiello, BCR, B | 1/0 |
| EX 11 | 3/22/06 | 5/10/06 | Wiot, BCR, B | No CWP |

---

[4] This x-ray does not meet the standards adopted by the Regulations at 20 C.F.R. § 718.102 (2002). Thus, this x-ray cannot form the basis for a finding of the existence of clinical pneumoconiosis. See 20 C.F.R. § 718.202(a)(1)(2002).

According to the regulations concerning the development of evidence, "[t]he responsible operator designated pursuant to § 725.410 shall be entitled to obtain and submit, in support of its affirmative case, no more than two chest x-ray interpretations . . . ." 20 C.F.R. § 725.414(a)(3)(i) (2003). Similarly, "[t]he claimant shall be entitled to submit, in support of his affirmative case, no more than two chest x-ray interpretations." 20 C.F.R. § 725.414(a)(2)(i) (2003). The regulations further state that

> [t]he claimant shall be entitled to submit, in rebuttal of the case presented by the party opposing entitlement, no more than one physician's interpretation of each chest x-ray . . . submitted by the designated responsible operator or the fund, as appropriate, under paragraph (a)(3)(i) or (a)(3)(iii) of this section and by the Director pursuant to § 725.406.

20 C.F.R. § 725.414(a)(2)(ii) (2003). Similarly, for purposes of rebuttal, an employer is entitled to submit no more than one interpretation of each chest x-ray submitted by the claimant. 20 C.F.R. § 725.414(a)(3)(ii) (2003).

As part of his evidence, the Claimant submitted CX 10. (CX 10) This exhibit constitutes a letter from the Department of Health and Humans Services, dated January 1, 2001, to the Chief of the Division of Health concerning the results of an x-ray of the Claimant's chest. (CX 10) The results of this x-ray will not be considered, since the Claimant has already designated two x-ray interpretations in support of his affirmative case. Since the limitations set forth in 20 C.F.R. § 725.414 (2003) are mandatory and cannot be waived, CX 10 cannot be considered. Moreover, CX 10 fails to show the date the x-ray was taken, the date the x-ray was read by a doctor, the quality of the x-ray film, the name of the doctor who interpreted the x-ray, the qualifications of the doctor who interpreted the x-ray, or the type of opacities found. It therefore does not meet the standards for x-rays set forth in 20 C.F.R. §§ 718.202(a)(1); 718.102 (2002).

Where two or more x-ray reports are in conflict, the radiological qualifications of the physicians interpreting the x-rays must be considered. 20 C.F.R. § 718.202(a)(1) (2003). Readings by physicians who are both Board-certified radiologists and B-Readers are generally entitled to the greatest weight. Roberts v. Bethlehem Mines Corp., 8 BLR 1-211, 1-213 (1985); Sheckler v. Clinchfield Coal Co., 7 BLR 1-128, 1-132 (1984).

Concerning the x-ray evidence as a whole and the qualifications of the physicians, I find that I give greater weight to the interpretations of the B-readers over board-certified radiologists. Meadows v. Westmoreland Coal Co., 6 BLR 1-773, 1-776 (1984); Brown v. Bethlehem Steel Corp., 4 BLR 1-527, 1-530 (1981).

The x-ray evidence in this case is very close. Physicians who were either dually qualified or B-Readers read x-rays from late 2002 through early 2006 as being both positive and negative for pneumoconiosis.

Six of the above-mentioned x-ray reports found that the Claimant had pneumoconiosis. Five reports found no evidence of pneumoconiosis. However, the Board has held that an administrative law judge is not required to defer to the numerical superiority of x-ray evidence. Wilt v. Wolverine Mining Co., 14 B.L.R. 1-70, 1-76 (1990).

- 7 -

A 8

X-ray evidence may also be weighed based upon the qualifications of the physicians. First, an x-ray was taken by Dr. Shockey on April 4, 2002. Since Dr. Shockey is neither a certified B-reader nor a board certified radiologist, the undersigned gives substantially less weight to his opinion. (DX 16) This x-ray was interpreted by Dr. Wiot as being negative for pneumoconiosis and as having a profusion of 1/0 by Dr. Cappiello. (DX 20, CX 1) Both Dr. Wiot and Dr. Cappiello are board certified radiologists and B-Readers. However, after examining the curriculum vitaes of both physicians, it is clear that Dr. Wiot's credentials are superior to Dr. Cappiello's.

Dr. Cappiello has had experience as a resident in diagnostic radiology (1973-1976). His specialty is in diagnostic radiology, with a subspecialty in cardiac radiology.[5] (CX 11) However, Dr. Wiot has had much more experience in the field of radiology. Dr. Wiot was the Chairman for the Department of Radiology at the University of Cincinnati Medical Center (1984-1985), the Director of the Department of Radiology at the University of Cincinnati Hospital (1968-1992),[6] the Professor Emeritus of Radiology at the University of Cincinnati (1998-present),[7] a consulting radiologist at the Cincinnati Veterans' Administration Hospital (1962-present) and the Chief of Radiology at the Cincinnati Children's Hospital Medical Center (1973-1992). (DX 19) He has also held several positions on the American Board of Radiology throughout the past thirty years and he has held several positions with the American College of Radiology, including President from 1983-1984. (DX 19) He has also been a member of multiple professional societies involving radiology. (DX 19) He has authored or co-authored approximately fifty papers dealing with various aspects of diagnostic radiology. (DX 19) Moreover, much of Dr. Wiot's experience involves the area of pneumoconiosis. (DX 19)

Thus, although both Dr. Cappiello and Dr. Wiot are board certified radiologists and B-Readers, the undersigned finds Dr. Wiot to have vastly superior qualifications. His interpretation is thus given greater weight.

An x-ray dated September 9, 2002 was read as being negative for pneumoconiosis by Drs. Repsher and Wiot. (DX 23, DX 21) It was read as 1/1 by Dr. Ahmed and 1/0 by Dr. Cappiello. (CX 7, CX 11) For the reasons noted above, Dr. Wiot's interpretation is given greater weight than Dr. Cappiello's interpretation.

Dr. Ahmed is board certified in radiology. (CX 8) He is also a B-reader. (CX 8) He is currently the attending radiologist at Princeton Community Hospital in Princeton, WV. (CX 8) He was a resident in diagnostic radiology, an attending radiologist and an instructor in radiology

---

[5] This is the only information that can be determined from Dr. Cappiello's Curriculum Vitae. Dr. Cappiello submitted a two-page Curriculum Vitae, however it appears that the second page of this report is a piece of Dr. Ahmed's Curriculum Vitae, given that license numbers listed on the second page of Dr. Cappiello's Curriculum Vitae are the same license numbers that appear on the first page of Dr. Ahmed's Curriculum Vitae.

[6] He was also the Co-Director of the Department of Radiology at the Cincinnati General Hospital (1966-1967), the Associate Director of the Department of Radiology at the Cincinnati General Hospital (1963-1966) and the Assistant Director of the Department of Radiology at the Cincinnati General Hospital (1961-1963). (EX 1)

[7] He was also the Professor of Radiology at the University of Cincinnati (1966-1998), the Associate Professor of Radiology at the University of Cincinnati (1962-1966) and the Assistant Professor of Radiology at the University of Cincinnati (1959-1962). (EX 1)

at Mt. Sinai Medical Center. (CX 8) He is also a member of the American College of Radiology and the Radiological Society of North America. (CX 8) He has received substantial continuing medical education in the field of radiology. Dr. Repsher is a B-Reader. (DX 22) He had a fellowship in pulmonary and critical care medicine (1970-1972). (DX 22) He has an academic appointment as Associate Clinical Professor of Medicine Division of Pulmonary Sciences at the University of Colorado. (DX 22) He has written several journal articles and spoken at multiple symposiums on the topic of pulmonary medicine, including COPD. (DX 22)

As is noted above, readings by physicians who are both Board-certified radiologists and B-Readers are generally entitled to the greatest weight. Roberts v. Bethlehem Mines Corp., 8 BLR 1-211, 1-213 (1985). Thus, Dr. Ahmed's reading is entitled to greater weight than Dr. Repsher's reading.

X-rays dated June 14, 2005 and March 22, 2006 were also read by Drs. Cappiello and Wiot. For the reasons stated above, although both Dr. Cappiello and Dr. Wiot are board certified radiologists and B-Readers, the undersigned finds Dr. Wiot to have superior qualifications. His interpretation of each of these x-rays is thus given greater weight than Dr. Cappiello's interpretation of each of these x-rays.

In this case, the Claimant bears the burden of proof. After reviewing the qualifications of the physicians reading the reports, I find that the Claimant has not established the presence of pneumoconiosis pursuant to §718.202(a)(1).

*Autopsy/Biopsy Reports:*

No autopsy or biopsy reports are present in the record. Therefore, the Claimant has not established the presence of pneumoconiosis pursuant to § 718.202(a)(2).

*Establishing Pneumoconiosis Pursuant to § 718.202(a)(3)*

The presumptions described in §§ 718.304, 718.305 and 718.306 are not applicable. Therefore, the Claimant has not established the presence of pneumoconiosis pursuant to § 718.202(a)(3).

*Medical Reports*

Under § 718.202(a)(4), a determination of pneumoconiosis may also be made if a physician, exercising sound medical judgment, notwithstanding a negative x-ray, finds that the miner suffered from pneumoconiosis as defined in § 718.201.

Medical reports should be well-reasoned and well-documented. Case law has established what a well-reasoned, well-documented medical report entails. A "documented" opinion is one that sets forth the clinical findings, observations, facts and other data on which the physician based the diagnosis. Fields v. Island Creek Coal Co., 10 B.L.R. 1-19, 1-22 (1987). An opinion may be adequately documented if it is based on items such as a physical examination, symptoms, and the patient's history. See Hoffman v. B & G Construction Co., 8 B.L.R. 1-65, 1-66 (1985);

-9-

A 10

Hess v. Clinchfield Coal Co., 7 B.L.R. 1-295, 1-296 (1984). A "reasoned" opinion is one in which the administrative law judge finds the underlying documentation adequate to support the physician's conclusions. See Fields, 10 B.L.R. at 1-22.

Dr. Mark Shockey

On April 4, 2002, the Claimant was examined by Dr. Mark Shockey. (DX 11) The Claimant noted that, since May 1989, he had been employed by the Employer as a safety inspector and shift foreman. (DX 11) The Claimant also noted that, from 1962 until 1992, he smoked approximately one pack of cigarettes per day. (DX 11)

The Claimant told Dr. Shockey that he experienced a small amount of daily sputum, occasional coughing, and dyspnea. (DX 11) His dyspnea prevented him from walking more than one mile on level ground or climbing two flights of stairs without becoming winded. (DX 11)

Dr. Shockey's physical examination of the Claimant revealed rales and wheezes. (DX 11) A chest x-ray showed COPD and coal workers' pneumoconiosis. (DX 11, DX 16) The ventilatory study report revealed moderate obstruction. (DX 11, DX 15) The arterial blood gas study report revealed low blood gas values. (DX 11, DX 15)

Dr. Shockey concluded that the Claimant had coal workers' pneumoconiosis and COPD due to the Claimant's coal mine employment and history of smoking. (DX 11) Dr. Shockey believed that the COPD and the coal workers' pneumoconiosis caused mild impairment. (DX 11)

The undersigned finds Dr. Shockey's opinion, which is based upon physical examination, test results, x-ray reports, and the Claimant's work, social and medical histories, to be well-documented and well-reasoned.

Dr. Lawrence Repsher

Dr. Repsher examined the Claimant in September of 2002. (DX 23) The Claimant informed Dr. Repsher that he had worked as an underground coal miner for approximately thirty years. (DX 23) Most recently, he had been employed as an acting general mine foreman. (DX 23)

When asked about his smoking history, the Claimant stated that he smoked one pack per day for approximately thirty years. (DX 23) He had quit smoking between seven and ten years earlier. The Claimant noted that he had smoked a pipe transiently, but "never inhaled." (DX 23) The Claimant also told Dr. Repsher that he chewed tobacco. (DX 23)

The Claimant denied any respiratory symptoms, other than slowly progressive mild dyspnea on exertion. (DX 23) He denied any cough, chills, fevers, sweats or weight loss. (DX 23) A physical examination of the Claimant revealed nothing abnormal. (DX 23) Height was measured at seventy-two inches and weight was 239 pounds. (DX 23)

Dr. Repsher read the Claimant's x-ray as showing no evidence of coal workers' pneumoconiosis. (DX 23) Pulmonary function tests revealed "mild COPD without immediate bronchodilator response. Lung volumes were normal. The diffusing capacity is mildly reduced, consistent with mild emphysema." (DX 23) The arterial blood gas values were decreased. (DX 23)

Dr. Repsher concluded that there was "no evidence of coal workers' pneumoconiosis," that there was "mild COPD of no present clinical significance," that the Claimant had "moderate hypoxemia at rest, of no present clinical significance, since there is no evidence of even early cor pulmonale," and that there was "probable, mild, residual cigarette smoking habit." (DX 23) Dr. Repsher stated that, "as a result of the above, it is my opinion that [the Claimant] is not now and never has suffered from coal workers' pneumoconiosis or any other pulmonary or respiratory condition, either caused by or aggravated by his employment with Blue Mountain Energy Company as an underground coal miner." (DX 23)

Dr. Repsher based this opinion on multiple things. First, the Claimant had "no chest x-ray evidence of coal workers' pneumoconiosis." (DX 23) Second, the Claimant had "no pulmonary function test evidence of coal workers' pneumoconiosis. Coal workers' pneumoconiosis, when clinically significant, is primarily a restrictive disease. [The Claimant] has pure obstructive disease, which is a characteristic finding of cigarette smoking induced COPD and emphysema." (DX 23) Third, the Claimant's "symptoms of dyspnea on exertion are most likely due to his obesity and relatively sedentary life style." (DX 23)

The Claimant argues that Dr. Repsher's medical report must be completely discredited because of his statement that "[c]oal workers' pneumoconiosis, when clinically significant, is primarily a restrictive disease. [The Claimant] has pure obstructive disease, which is a characteristic finding of cigarette smoking induced COPD and emphysema." (DX 23) The Claimant believes that this statement goes against the position taken by the Department of Labor that the inhalation of coal mine dust can cause obstruction.

It is true that a physician's opinion cannot be given credit if it is hostile to the Act. See Wetherill v. Green Construction Co., 5 B.L.R. 1-248, 1-252 (1982). However, Dr. Repsher did not state that the inhalation of coal mine dust cannot cause obstruction. He stated that coal workers' pneumoconiosis is primarily a restrictive disease. He did not determine that coal workers' pneumoconiosis was only a restrictive disease. Thus, Dr. Repsher's opinion is not deemed to be hostile to the Act.[8] Therefore, Dr. Repsher's report will not be discredited.

Moreover, Dr. Repsher based his opinion that the Claimant did not have coal workers' pneumoconiosis or any respiratory condition caused by his coal mine work on more than simply his finding that coal workers' pneumoconiosis may be a restrictive disease. He also looked at x-ray evidence and based his findings on his physical examination of the Claimant and the

---

[8] See Stilner v. Island Creek Coal Co., 86 F.3d 337 (4th Cir. 1996)(holding that a physician's opinion should not be discredited merely because he states that the miner "likely" would have exhibited a restrictive impairment in addition to chronic obstructive pulmonary disease if he had coal workers' pneumoconiosis).

A 12

Claimant's work, social and medical histories. Therefore, Dr. Repsher's report will be given equal weight.

## Dr. Joseph Renn

Dr. Renn was board certified in internal medicine and in pulmonary disease and was a B-reader of x-rays. (EX 10) Dr. Renn relied on treatment records, pulmonary function tests, arterial blood gas tests, medical reports from Drs. Shockey and Repsher, CT scans and x-ray reports when drafting his independent medical review of the Claimant. (EX 4) From the information contained in the above-mentioned sources, Dr. Renn was able to obtain an understanding of the Claimant's occupational history, the Claimant's history of tobacco use and the Claimant's past medical history. (EX 4)

After reviewing the above-mentioned information related to the Claimant's respiratory system, Dr. Renn determined that the Claimant had "very mild COPD owing to tobacco smoking" as well as a "very mild obstructive ventilatory defect." (EX 4). He also determined that "pneumoconiosis does not exist." (EX 4)

Dr. Renn stated that the Claimant was "a sixty-two year-old who ... does not have pneumoconiosis." (EX 4) He concluded that

> it is with a reasonable degree of medical certainty that none of the above diagnoses were either caused, or contributed to, by his exposure to coal mine dust. It is with a reasonable degree of medical certainty that his very mild COPD is a result of his years of tobacco smoking rather than exposure to coal mine dust.

(EX 4)

Dr. Renn further concluded that, "when considering only his respiratory system, it is with a reasonable degree of medical certainty that he is not totally and permanently impaired to the extent that he would be unable to perform his last known coal mining job as safety inspector and shift foreman or any similar work effort." (EX 4).

In a deposition taken on June 1, 2006, Dr. Renn stated that his finding, that the Claimant's mild obstructive breathing impairment was not related to coal mine dust, was based on

> the fact that [the Claimant] had the pattern ... that showed that his obstructive airway disease is a result of tobacco smoking; that being the fact that his FEF 25-75 is disproportionately reduced when compared with his peak expiratory flow rate and his $FEV_1$. That is the pattern of tobacco smoking. It is not the pattern of a person with medical coal workers' pneumoconiosis or coal mine dust-induced obstructive airway disease. Then, in 2002, he had a reduction of his diffusing capacity which was at that time by a percentage mildly reduced, but was normal when it was corrected for the alveolar volume. That, too, is a pattern consistent

A 13

with tobacco smoking but not consistent with a disease caused by coal workers' pneumoconiosis.[9]

(EX 10, pg. 6-7)

Further, on cross-examination, when the Claimant's counsel stated, "so, you found no medical coal workers' pneumoconiosis present here and you testified that was based on the absence of restriction on the pulmonary function test," Dr. Renn stated that his determination was also based on x-ray evidence and "the pattern of the dynamic ventilatory function in that [the Claimant] had obstructive airways disease, which could be consistent with coal workers' pneumoconiosis, but the pattern that he had is consistent with tobacco smoke-induced obstructive airways disease." (EX 10, pg. 50-51) Thus, Dr. Renn attributed all of the Claimant's obstruction to his smoking history. (EX 10, pg. 51)

When asked if the Claimant had any coal mine dust-related disease causing him impairment, Dr. Renn said "no." (EX 10, pg. 40) Dr. Renn stated that the exercise test in 2005 showed that there was no wasted ventilation and that fitness might be limited by heart disease. (EX 10) He testified that the Claimant's blood gas abnormality was not related to coal mine work as he would have associated diminished breathing reserve. (EX 10) The Claimant exercised to 5.9 mets which was beyond the required exertion level in the mines. (EX 10) The physician attributed the gas exchange abnormality to smoking rather than to mining. (EX 10).

The undersigned finds Dr. Renn's opinion, which is based upon treatment records, the Claimant's work, social and medical histories, and other physicians' medical reports, test results, and x-ray reports to be well-documented and well-reasoned.

Dr. Robert Cohen

In June of 2005, the Claimant was examined by Dr. Robert Cohen. (CX 5) The Claimant informed Dr. Cohen that his chief complaint was shortness of breath. (CX 5) The Claimant stated that his shortness of breath began five to seven years before, but had gotten worse in the preceding two years. (CX 5) The Claimant also complained of a cough, which started approximately five years before, but had gradually worsened. (CX 5) Further, he noted sputum production, which began two years before, but had also gradually worsened. (CX 5)

The Claimant also informed Dr. Cohen that he had been employed as an acting general foreman with Blue Mountain Energy from 2001 until 2004. (CX 5) He stated that he spent most of his time underground and that he had to do some hands-on work, including performing a complete examination of the mine. (CX 5) He told Dr. Cohen that he walked ten miles per day and often had to lift and carry objects weighing up to 100 pounds. (CX 5) He stated that he did not have any difficulty lifting items like logs, but that he experienced "difficulty moving them

---

[9] Dr. Renn bases this determination, in part, on the NIOSH publication entitled "The Criteria for Recommended Standard Occupational Exposure to Respirable Coal Mine Dust." (EX 10, pg. 53) Dr. Renn also cited to other publications in support of his conclusions. These publications were all admitted into the record as attachments to Dr. Renn's deposition.

- 13 -

A 14

from one place to another which was getting worse gradually." (CX 5) He noted that he wore a respirator mask between five and ten percent of the time. (CX 5)

The Claimant also told Dr. Cohen that he smoked an average of one pack of cigarettes per day between 1962 and 1996, excepting three years during the 1980s when he quit cigarettes and instead smoked, but did not inhale, a pipe 1-3 times per day. (CX 5) He smoked a pipe 1-3 times a day again between 1996 and 2000. (CX 5)

Dr. Cohen's physical examination of the Claimant revealed nothing abnormal. (CX 5) As part of his examination, Dr. Cohen took an x-ray of the Claimant and performed an arterial blood gas study and a pulmonary function study.[10]

Based upon his own examination of the Claimant, the results of the tests he performed on the Claimant, the Claimant's work, medical and smoking histories, and a review of multiple treatment records and prior medical reports, Dr. Cohen concluded that the Claimant had pneumoconiosis.[11] (CX 5)

The physician stated that he disagreed

> with Dr. Renn's and Dr. Repsher's opinions that [the Claimant] has very mild COPD due to smoking and not pneumoconiosis. He does have a mild obstructive impairment on spirometry, but severe diffusion impairment as well as severe gas exchange abnormalities with exercise. These impairments are caused by his exposure both to coal mine dust and to tobacco smoke. His $PO_2$ measured in the 50's is quite significant and means there is a significant loss in

---

[10] The results of this x-ray will not be considered, since the Claimant has already designated two other x-ray interpretations in support of his affirmative case. Since the limitations set forth in 20 C.F.R. § 725.414 (2003) are mandatory and cannot be waived, no x-ray reading by Dr. Cohen may be considered. The results of the blood gas study and the pulmonary function study, in contrast, may be considered, since the Claimant identified these studies by Dr. Cohen as part of his evidence on the Evidence Summary Form, and since the Claimant did not submit more blood gas or pulmonary function studies than the Regulations permit. Spirometry revealed a normal FVC and a mildly reduced $FEV_1$. (CX 5) Blood gases showed mild respiratory alkalosis. (CX 5) There was no significant response to bronchodilators. (CX 5) An exercise tolerance test went for about eleven minutes and was stopped due to leg fatigue and dyspnea. (CX 5)

[11] Dr. Cohen based his opinion that the Claimant had pneumoconiosis on multiple factors, including x-ray evidence. This included Dr. Cohen's reading as well as a September 9, 2002 reading by Dr. Wiot finding no pneumoconiosis, an April 4, 2002 reading by Dr. Shockey, who Dr. Cohen noted was not a B-Reader nor a board certified radiologist, finding a 1/1 profusion of opacities, an April 4, 2002 reading by Dr. Wiot finding no pneumoconiosis, a September 7, 2001 reading by Dr. Bechtel noting subtle nodularity suggesting coal workers' pneumoconiosis, and a letter dated January 2, 2001 stating that the Claimant had coal workers' pneumoconiosis. (CX 5)

As is noted above, the x-ray reading by Dr. Cohen and the January 2, 2001 letter are inadmissible. Given the remaining x-ray evidence available to Dr. Cohen, it seems unlikely that a finding of clinical pneumoconiosis could be maintained. However, Dr. Cohen stated in his opinion that a lack of positive x-ray reports "would not change [his] opinion that [the Claimant] has substantial historical and physiological evidence of coal workers' pneumoconiosis related to coal dust exposure." (CX 5) Moreover, Dr. Cohen's finding of legal pneumoconiosis was based on a vast array of information besides the x-ray evidence, including the Claimant's thirty year history of coal mine employment, physical symptoms consistent with chronic lung disease, the results of the pulmonary function and cardiopulmonary exercise testing and the lack of exposure to other occupational hazards that would explain his physical problems. Thus, Dr. Cohen's opinion that the Claimant has legal pneumoconiosis is well-documented and well-reasoned and will therefore receive equal weight.

[the Miner's] ability to transfer oxygen to exercising tissues. I disagree with Dr. Repsher's opinion that [the Miner's] hypoxemia is of no clinical significance and that his symptoms of dyspnea are explained by obesity and relatively sedentary life style. He has a clearly abnormal ventilatory limit to exercise and abnormal gas exchange. This is not due to obesity. People may be dyspneic due to obesity, but they would not have the objective findings of diffusion impairment and gas exchange with exercise that [the Claimant] has.

(CX 5).

Dr. John Parker

Dr. Parker reviewed treatment records, medical reports and the Claimant's social, work and medical records. (CX 6) In April of 2006, Dr. Parker drafted a report based upon his review of the above-mentioned information. (CX 6) The physician stated that

[i]n view of the above medical records and employment history it is my medical opinion that [the Claimant] suffers from pneumoconiosis, manifested as a[n] obstructive lung disease, with an $FEV_1$ revealing mild but gradually progressing reductions.[12] His $FEV_1/FVC$ ratio has also overall become progressively reduced over time, making it clear that he has an obstructive impairment. His two most recent PFTs show very little improvement with bronchodilators, making it clear that asthma is not the source of his obstruction. His lung volumes show that restrictive disease does not account for his impairment. As has been seen in significant subsets of coal miners, [the Claimant's] arterial blood gas studies reveal a substantial impairment, beyond what is seen on the spirometry. The recent cardiopulmonary study is very strong evidence for a significant functional impairment due to chronic respiratory disease. [The Claimant] also has a quite severely reduced diffusing capacity, which further

---

[12] Dr. Parker based his opinion that the Claimant had pneumoconiosis on multiple factors, including x-ray evidence. (CX 6) This included Dr. Cohen's x-ray reading as well as a September 9, 2002 reading by Dr. Wiot finding no pneumoconiosis, an April 4, 2002 reading by Dr. Shockey finding a 1/1 profusion of opacities, an April 4, 2002 reading by Dr. Wiot finding no pneumoconiosis, a September 7, 2001 reading by Dr. Bechtel noting subtle nodularity suggesting coal workers' pneumoconiosis, and a letter dated January 2, 2001 stating that the Claimant had coal workers' pneumoconiosis. (CX 6)

As is noted above, the x-ray reading by Dr. Cohen and the January 2, 2001 letter are inadmissible. Given the remaining x-ray evidence available to Dr. Parker, it seems unlikely that a finding of clinical pneumoconiosis could be maintained.

However, it does not appear that Dr. Parker ever even made a finding of clinical pneumoconiosis. He stated that "[i]n rendering this opinion, I am aware that a number of x-ray interpretations have been reported to be negative for the classical lesion of coal workers' pneumoconiosis....[However,] the epidemiological evidence for a causal link between coal dust and COPD (even in the absence of chest x-ray evidence for opacities consistent with CWP) is massive and irrefutable." (CX 6)

Further, Dr. Parker's finding of legal pneumoconiosis is based upon multiple factors other than the x-ray reports, including medical reports, test results, and the Claimant's social, work and medical histories.

Thus, Dr. Parker's report is considered to be well-documented and well-reasoned and will therefore receive equal weight.

- 15 -

A 16

confirms the substantial nature of his impairment and progressively worsening hypoxemia, with normal lung volumes. [The Claimant's] COPD with moderately severe hypoxemia and diffusing impairment is caused in substantial part by both his 30 years of coal mine employment, ending in 2004 and by his approximately 30 pack year smoking history ending around 1996.... Concerning the opinions of Dr. Renn and Dr. Repsher, attributing [the Claimant's] COPD solely to smoking, I cannot agree in view of the epidemiological evidence, the particular history of [the Claimant's] coal mine work and smoking, and the clinical evidence and progression, as discussed above. I also disagree with their opinions that [the Claimant] is not disabled.

(CX 6) Dr. Parker then stated,

[i]n my opinion, [the Claimant's] respiratory disorder is substantially due to his occupational exposure to coalmine dust and clearly not only the result of tobacco smoke. In addition, his respiratory impairment would prevent the performance of his last coalmine job. I also note that in fact [the Claimant] had a complete cardiopulmonary exercise test, which revealed significant gas exchange limitation due to exercise, which was clearly due to his pneumoconiosis. This is the best evidence we have for his inability to do physically demanding work.

(CX 6).

Dr. Parker's report is considered to be well-documented and well-reasoned.

Supplemental Reports

On July 10, 2006, Dr. Cohen reviewed the hearing transcript and Dr. Renn's deposition. (CX 13) Dr. Cohen disagreed with Dr. Renn's determination that the Claimant's FEF 25-75 rules out coal dust exposure as a cause of lung disease. (CX 13) Dr. Cohen further disagreed with Dr. Renn's finding that the Claimant's pattern of diffusion impairment rules out coal mine dust exposure as a cause of the Claimant's lung disease. (CX 13) Dr. Cohen stated that

It remains my opinion, even after reviewing the deposition and hearing testimony discussed above, and the comments made by Drs. Renn and Repsher, that the sum of the medical evidence in conjunction with this patient's work history still indicate that the miner's 30 years of coal mine dust exposure as well as his 30 pack years of exposure to tobacco smoke were significantly contributory to the development of his mild obstructive lung disease, diffusion impairment, and gas exchange abnormalities on arterial blood gases. This degree of impairment is clearly disabling for the heavy labor of his last coal mining job as an acting general foreman.

(CX 13).

On July 31, 2006, Dr. Renn noted that he had reviewed the Claimant's testimony detailing his job duties. (EX 13) He stated that his review of these duties did not change his opinion that the Claimant was able to perform his previous job.[13] (EX 13) On September 18, 2006, Dr. Renn responded to Dr. Cohen's July 2006 report. (EX 14) Dr. Renn stated that "Dr. Cohen has mischaracterized my deposition testimony. My opinion is that the FEF 25-75 is disproportionately reduced in those individuals in whom it has been affected by tobacco smoke whereas in those in whom it has been affected by coal mine dust exposure or the development of coal workers' pneumoconiosis it is proportionately reduced." (EX 14) Further, concerning whether the Claimant's pattern of diffusion impairment rules out coal mine dust exposure as a cause of lung disease, Dr. Renn stated,

> Dr. Cohen has stated that the Dl/Va 'does not add much useful information.' Johnson addressed the question of the validity of the DLCP and the Dl/Va. He evaluated 2,313 patients. There were subgroups of patients with asthma, emphysema, extrapulmonary lung disease, interstitial lung disease and lung resection. He stated, 'unadjusted DLCO and KCO percent predicted values showed large differences and much variability, so can be misleading. As expected, KCO and DLCO were nearly identical.' That is the Dl/Va. He further stated, 'Adjusting predicted DLCO and KCO for alveolar volume provides a better assessment of lung function.' Thusly is Dr. Cohen's contention effectively controverted. In response to his comments regarding the levels of diffusion impairment in coal miners, I believe my deposition testimony and the scientific articles themselves attest strongly to the validity of my statements. It speaks volumes that Dr. Cohen remained silent in regard to several of the scientific articles. He mentioned the paucity of subjects in the 1982 article. However, he did not mention that 511 coal workers were studied by Wang and Christiani, including those having chest radiographs in stages 0 through category 3. I view his failure to reply to all of the findings published in the scientific treatises to which I referred as denoting his inability to refute them with scientific literature of equal standing.

(EX 14)

Dr. Renn also stated,

> ...It remains my opinion, even after reviewing Dr. Cohen's Second Supplemental Consulting Medical Opinion, that [the Claimant] does not have a coal mine dust-related disease that is causing him impairment. Further, he does not have a totally-impairing either pulmonary or respiratory impairment from any cause.

(EX 14).

---

[13] Based on this supplemental report, the undersigned finds that Dr. Renn had a complete picture of the Claimant's work history and previous job duties.

A 18

Dr. Cohen responded to Dr. Renn's September 2006 remarks on October 19, 2006. Dr. Cohen stated,

> Dr. Renn seems to think he can distinguish coal dust induced impairment from tobacco smoke induced impairment based on the reduction in the FEF 25-75. There is no basis whatsoever for this argument in the medical literature. The FEF 25-75 is not a good indicator of "small airways disease" and is only used as an indicator of early airway obstruction.

(CX 14) Dr. Cohen then stated that the pattern of diffusion impairment did not rule out coal mine dust exposure as a cause of the Claimant's lung disease. Dr. Cohen stated,

> Dr. Renn continues to support his opinion that the D1/Va is a useful measurement for distinguishing patterns of lung disease and cites an article published in the year 2000 which "effectively controverted" my opinion. The fact remains, regardless of what Dr. Renn thinks, the D1/Va does not give us much useful information and certainly cannot be used to determine whether or not coal mine dust is a cause of diffusion impairment. Not only does the AMA guides not even list the D1/Va in their tables, but the most recent American Thoracic Society and European Thoracic Society joint statement, published in 2005 after an extensive review of the literature also does not recommend giving this measurement any significant interpretive value.

(CX 14)

> Finally, Dr. Cohen determined that

> [i]t remains my opinion, even after reviewing the additional comments made by Dr. Renn, that the sum of the medical evidence in conjunction with this patient's work history still indicate that the miner's 30 years of coal mine dust exposure as well as his 30 pack years of exposure to tobacco smoke were significantly contributory to the development of his mild obstructive lung disease, diffusion impairment, and gas exchange abnormalities on arterial blood gases. This degree of impairment is clearly disabling for the heavy labor of his last coal mining job as an acting general foreman.

(CX 14).

Both the Employer and the Claimant submitted the above-listed supplemental reports as evidence in this trial. These reports were sent to the undersigned as either rebuttal evidence or rehabilitative evidence. The Regulations state that rebuttal evidence may consist of "no more than one physician's interpretation of each chest x-ray, pulmonary function test, blood gas study, autopsy or biopsy" that has been submitted by the opposing party. 20 C.F.R. §§ 725.414(a)(2)(ii); 725.414(a)(3)(ii) (2003).

- 18 -

A 19

When a party's rebuttal evidence tends to undermine the conclusion of a physician who prepared a medical report for the opposing party, that physician is entitled to submit an additional statement explaining his conclusion in light of the rebuttal evidence. 20 C.F.R. §§ 725.414(a)(2)(ii); 725.414(a)(3)(ii) (2003).

The evidence submitted by the parties in this case, which consisted of reports by Dr. Cohen reiterating why he believed that the Claimant did suffer from clinical and legal pneumoconiosis that was totally disabling and reports by Dr. Renn reiterating why he did not believe that the Claimant suffered from clinical or legal pneumoconiosis that was totally disabling, cannot properly be considered to be rebuttal or rehabilitative evidence. These reports do not meet the requirements for rebuttal or rehabilitative evidence set forth in 20 C.F.R. §§ 725.414(a)(2)(ii); 725.414(a)(3)(ii) (2003).

These reports are admissible, however, as supplemental opinions. See Stamper v. Westerman Coal Co., BRB No. 05-0946 BLA (July 26, 2006) (unpub.)(upholding the ALJ's finding that Dr. Baker's October 2000 report was a "supplemental opinion, in that it simply expounds on Dr. Baker's May 29, 1997 examination and report...." Id.).

The undersigned finds all of these supplemental reports to be well-documented and well-reasoned.

CT Scans

The Board has determined that CT scan evidence should be weighed separately from the chest x-rays. Melnick v. Consolidation Coal Co., 16 B.L.R. 1-31 (1991)(en banc).

In the present case, the Employer submitted Dr. Jerome Wiot's interpretation of a CT scan dated February 9, 1998. (EX 1) Dr. Wiot determined the films were of an acceptable quality by ILO standards. (EX 1) He further stated that the CT scan showed "no evidence of coal workers' pneumoconiosis. There are a few small nondescript nodules noted and a patchy area of air space disease in the superior segment of the right lower lobe. This is not a manifestation of coal dust exposure." (EX 1) [14]

The CT scan evidence fails to establish that the Claimant suffers from coal workers' pneumoconiosis.

Treatment Records

In Dempsey v. Sewell Coal Co., 23 B.L.R. 1-47 (2004) (en banc), the Board held that treatment records, containing multiple pulmonary function and blood gas studies that exceed the limitations at § 725.414, are properly admitted. This is so regardless of whether the records are offered by a claimant or an employer.

---

[14] Other CT scans which were taken in the course of the Claimant's general medical treatment are also included in the record as treatment records. These CT scans do not discuss the presence or absence of pneumoconiosis.

In the present case, treatment records were submitted into evidence. In February 1998, at St. Mary's Hospital, the Claimant underwent a fiberoptic bronchoscopy. The diagnosis was "improving hemoptysis and resolving infiltrate, possibly due to bronchitis or pneumonitis." (EX 9)

In September 2000, the Miner was evaluated at the Rangely Family Medicine Encounter. Complaints included shortness of breath on walking. (EX 8) Spirometry revealed a 15% improvement after bronchodilator therapy. (EX 8) Impressions were chronic obstructive pulmonary disease with reversibility and fatigue. (EX 8).

In September 2001, the Claimant reported dyspnea on climbing a grade to Dr. Bechtel. (EX 6) Spirometry in September 2000 had shown moderate lung disease with a significant response to bronchodilators. (EX 6) Examination was negative except for a little wheeze on the right and a small amount of sputum production. (EX 6)

Conclusion

Based upon all of the afore-mentioned evidence, the undersigned must now determine whether the Claimant has established, through medical reports, that he has pneumoconiosis.

As is noted above, under § 718.202(a)(4), a determination of pneumoconiosis may be made if a physician, exercising sound medical judgment finds that the miner suffered from pneumoconiosis as defined in § 718.201.

Pneumoconiosis is defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes both medical, or clinical, pneumoconiosis and statutory, or legal, pneumoconiosis." 20 C.F.R. § 718.201 (2003).

Clinical pneumoconiosis is defined as "those diseases recognized by the medical community as pneumoconiosis, i.e. the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201 (2003). This includes, "but is not limited to, coal workers' pneumoconiosis." Id.

Dr. Shockey concluded that the Claimant had coal worker's pneumoconiosis, based on x-ray evidence. (DX 11) Dr. Repsher determined, based on his examination of the x-rays, that the Claimant had no evidence of coal workers' pneumoconiosis. (DX 23) Dr. Renn also determined, with a reasonable degree of medical certainty, that the Claimant did not have pneumoconiosis. (EX 4) Dr. Cohen found that the Claimant had pneumoconiosis. (CX 5) However, as is noted above, Dr. Cohen relied upon inadmissible x-rays when making this determination. Given the x-ray evidence available to Dr. Cohen after discounting the inadmissible reports, it seems unlikely that a finding of clinical pneumoconiosis could be maintained. It appears that Dr. Parker only made a finding of legal pneumoconiosis. (CX 6) However, even if Dr. Parker had made a finding of clinical pneumoconiosis, he, like Dr. Cohen,

- 20 -

A 21

relied upon inadmissible x-ray reports. Thus, a finding of clinical pneumoconiosis could not be maintained by Dr. Parker either.

The medical reports in this case do not establish the existence of clinical pneumoconiosis.

Legal pneumoconiosis includes "any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201 (2003)(emphasis added).

There is clearly a difference of opinion among well-qualified physicians who have given detailed statements in this case concerning whether the Claimant has legal pneumoconiosis.

Dr. Shockey concluded that the Claimant had COPD due to the Claimant's coal mine employment and history of smoking. (DX 11)

Dr. Repsher found "mild COPD of no present clinical significance." (DX 23) He concluded that the Claimant has never suffered from any pulmonary or respiratory condition, either caused by, or aggravated by, his employment with Blue Mountain Energy. (DX 23)

Dr. Renn determined that the Claimant had very mild COPD due to his history of smoking, as well as a very mild obstructive ventilatory defect. (EX 4). He stated, with a reasonable degree of medical certainty, that the Claimant did not have pneumoconiosis. (EX 4) He also noted that, while pneumoconiosis can manifest itself as obstructive airway disease, the Claimant's pattern of obstruction proved that the Claimant's obstructive airway disease was due to tobacco smoking. (EX 4) Dr. Renn offered extensive research to support this opinion. (EX 10, EX 14) He cited to multiple articles from medical journals such as the American Journal of Industrial Medicine and the British Journal of Occupational and Environmental Medicine. (EX 10) His opinion is considered to be well-reasoned and well-supported.

Dr. Cohen disagreed with Dr. Renn's and Dr. Repsher's opinions that Claimant's very mild COPD was due to smoking and not pneumoconiosis. (CX 5) He concluded that the Claimant had mild obstructive impairment on spirometry and severe diffusion impairment as well as severe gas exchange abnormalities with exercise. (CX 5) He believed that these impairments were caused by his exposure both to coal mine dust and tobacco smoke. (CX 5) Dr. Cohen's disagreement with Dr. Renn's conclusion that the Claimant's pattern of obstruction proved that the Claimant's obstructive airway disease was due to tobacco smoking was also well supported. He, too, cited to multiple studies and articles from medical journals. (CX 13, CX 14)

Dr. Parker stated that it was his opinion that the Claimant suffered from pneumoconiosis, manifested as an obstructive lung disease, which was caused by both his coal mine employment and his smoking history. (CX 6)

All of the physicians are extremely qualified to discuss the Claimant's pulmonary problems. Except for Dr. Shockey, who did not provide an extensive curriculum vitae,[15] all have had significant experience with internal and pulmonary medicine, including the publication of articles in this field, professional appointments in the field of pulmonary medicine and teaching positions at local universities. Further, all of their reports are well-reasoned and well-documented. Moreover, despite the fact that Drs. Renn and Cohen disagree as to the meaning of some of the Claimant's test results, their findings and reports are each well-supported.

The undersigned finds that these reports are evenly balanced, and should receive equal weight. As is noted above, the Claimant bears the burden of establishing the presence of pneumoconiosis by a preponderance of the evidence. The Claimant has not proven that he has legal pneumoconiosis.

Since the Claimant has not established the presence of either clinical or legal pneumoconiosis, the criteria of §718.202(a)(4) has <u>not</u> been met.

### Entitlement

The Claimant failed to prove the existence of pneumoconiosis by x-ray, autopsy or biopsy, or by the report of a physician exercising sound medical judgment stating the Claimant suffers from pneumoconiosis. Since proving the existence of pneumoconiosis is necessary in order for the Claimant to receive benefits, his claim must be denied. The Claimant is not entitled to benefits under the Act.

### Attorney's Fees

The award of an attorney's fee under the Act is permitted only in cases in which the Claimant is found to be entitled to the receipt of benefits. Since benefits are not awarded in this case, the Act prohibits the charging of any fee to the Claimant for representation services rendered to him in pursuit of his claim.

### ORDER

The claim of T. G. for benefits under the Act is hereby **DENIED**.

*RK Malamphy*

RICHARD K. MALAMPHY
Administrative Law Judge

RKM/KBE/jcb

---

[15] It is noted, however, that Dr. Shockey is board certified in internal medicine and is designated a diplomate certified in the subspecialty of pulmonary disease.



BRB No. 07-0619 BLA

| | |
|---|---|
| T.G. | ) |
| | ) |
| Claimant-Petitioner | ) NOT-PUBLISHED |
| | ) |
| v. | ) |
| | ) |
| BLUE MOUNTAIN ENERGY | ) DATE ISSUED: **APR 1 5 2008** |
| | ) |
| and | ) |
| | ) |
| OLD REPUBLIC INSURANCE | ) |
| COMPANY, INCORPORATED | ) |
| | ) |
| Employer/Carrier- | ) |
| Respondents | ) |
| | ) |
| DIRECTOR, OFFICE OF WORKERS' | ) |
| COMPENSATION PROGRAMS, UNITED | ) |
| STATES DEPARTMENT OF LABOR | ) |
| | ) |
| Party-in-Interest | ) DECISION and ORDER |

Appeal of the Decision and Order – Denying Benefits of Richard K. Malamphy, Administrative Law Judge, United States Department of Labor.

Thomas E. Johnson (Johnson, Jones, Snelling, Gilbert & Davis, P.C.), Chicago, Illinois, for claimant.

Laura Metcoff Klaus (Greenberg Traurig LLP), Washington, D.C., for employer and carrier.

Before: DOLDER, Chief Administrative Appeals Judge, SMITH and HALL, Administrative Appeals Judges.

PER CURIAM:

Claimant appeals the Decision and Order – Denying Benefits (2004-BLA-5323) of Administrative Law Judge Richard K. Malamphy rendered on a claim filed pursuant to the provisions of Title IV of the Federal Coal Mine Health and Safety Act of 1969, as

A 24

amended, 30 U.S.C. §901 *et seq.* (the Act). The administrative law judge credited claimant with thirty years of qualifying coal mine employment, and adjudicated this claim, filed on June 15, 2001, pursuant to the provisions at 20 C.F.R. Part 718. The administrative law judge found the weight of the evidence insufficient to establish the existence of pneumoconiosis pursuant to 20 C.F.R. §718.202(a)(1)-(4). Accordingly, benefits were denied.

On appeal, claimant challenges the administrative law judge's weighing of the evidence in finding that claimant failed to establish the existence of pneumoconiosis pursuant to Section 718.202(a)(1), (4).[1] Employer responds, urging affirmance of the denial of benefits. The Director, Office of Workers' Compensation Programs, has declined to file a brief in this case.

The Board's scope of review is defined by statute. The administrative law judge's Decision and Order must be affirmed if it is rational, supported by substantial evidence, and in accordance with applicable law.[2] 33 U.S.C. §921(b)(3), as incorporated by 30 U.S.C. §932(a); *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, 380 U.S. 359 (1965).

In order to establish entitlement to benefits under 20 C.F.R. Part 718, claimant must demonstrate by a preponderance of the evidence that he is totally disabled due to pneumoconiosis arising out of coal mine employment. 20 C.F.R. §§718.3, 718.202, 718.203, 718.204. Failure to establish any one of these elements precludes entitlement. *Anderson v. Valley Camp of Utah, Inc.*, 12 BLR 1-111 (1989); *Trent v. Director, OWCP*, 11 BLR 1-26 (1987).

Claimant initially challenges the administrative law judge's exclusion of the letter from the Department of Health and Human Services advising the Mine Safety and Health Administration that claimant's x-ray had been "read by NIOSH-approved physicians who found Category 1, simple coal workers' pneumoconiosis." (MSHA letter). Claimant contends that the administrative law judge erred in excluding the MSHA letter from the

---

[1] We affirm, as unchallenged on appeal, the administrative law judge's finding with regard to the length of claimant's coal mine employment and his finding that the evidence of record did not establish the existence of pneumoconiosis pursuant to 20 C.F.R. §718.202(a)(2)-(3). *See Skrack v. Island Creek Coal Co.*, 6 BLR 1-710, 1-711 (1983).

[2] The Board will apply the law of the United States Court of Appeals for the Tenth Circuit, as the miner was last employed in the coal mining industry in Colorado. *See Shupe v. Director, OWCP*, 12 BLR 1-200, 1-202 (1989)(*en banc*); Director's Exhibit 2.

2

A 25

record, on the grounds that it exceeded claimant's two affirmative readings allowed under 20 C.F.R. §725.414(a)(2)(i) and because it failed to meet the standards for x-ray evidence as set forth in 20 C.F.R. §§718.202(a)(1) and 718.102, arguing that the administrative law judge should have entered the document into evidence as a treatment record under 20 C.F.R. §725.414(a)(4). Claimant's Exhibit 10; Decision and Order at 7; Claimant's Brief at 10. We disagree. The regulatory limitations on evidence permit no more than two x-ray interpretations in a party's affirmative case, and the administrative law judge properly determined that claimant had met his designated limit, but, in any event, that the MSHA letter failed to meet the standards for x-rays as set forth in Sections 718.202(a)(1) and 718.102. Decision and Order at 7. Furthermore, as evidentiary determinations are made by the administrative law judge, and claimant sought to admit the MSHA letter as positive x-ray evidence of pneumoconiosis, claimant may not now seek to gain its admittance as a treatment record while the case is pending before the Board. *See generally Dempsey v. Sewell Coal Co.*, 23 BLR 1-47 (2004)(*en banc*); *Harris v. Old Ben Coal Co.*, 23 BLR 1-273 (2007)(*en banc recon.*) (McGranery & Hall, JJ., concurring and dissenting), *aff'g* 23 BLR 1-98 (2006)(*en banc*) (McGranery & Hall, JJ., concurring and dissenting); Transcript at 8-9; Claimant's Post-Hearing Brief at 3, 5. Accordingly, we affirm the administrative law judge's finding that the MSHA letter was inadmissible under Section 725.414(a).

Claimant next argues that because Drs. Wiot, Cappiello, and Ahmed are all Board-certified radiologists and B readers, the administrative law judge erred in finding the qualifications of Dr. Wiot to be superior, as the administrative law judge failed to explain any relevant basis for his distinction. Claimant's Brief at 11-12; Decision and Order at 8. We disagree. While the administrative law judge noted the qualifications of Drs. Ahmed and Cappiello in the field of radiology, he permissibly accorded greater weight to the physician he determined had much more extensive radiological experience, including experience in the area of pneumoconiosis. Decision and Order at 8; Director's Exhibit 19; *see Wyoming Fuel Co. v. Director, OWCP [Brandolino]*, 90 F.3d 1502, 20 BLR 2-302 (10th Cir. 1996); *Dixon v. North Camp Coal Co.*, 8 BLR 1-31, 1-37 (1991); *Sheckler v. Clinchfield Coal Co.*, 7 BLR 1-128, 1-131 (1984).

Claimant further contends that in weighing the x-ray evidence, the administrative law judge erred in ignoring the party affiliation of the x-ray readers. Claimant's contention lacks merit. After properly finding that the MSHA letter was not an admissible x-ray reading, the administrative law judge considered each x-ray and the qualifications of the readers, and permissibly determined that the opinion of Dr. Shockey, who provided the Department of Labor examination, was entitled to less weight because he was neither Board-certified nor a B reader. Decision and Order at 7, 8. Furthermore, the identity of a party who hires a medical expert does not, by itself, demonstrate partiality or partisanship on the part of the physician. *See Urgolites v. Bethenergy Mines, Inc.*, 17 BLR 1-20 (1992); *Dixon v. North Camp Coal Co.*, 8 BLR 1-31, 1-37 (1991);

3

A 26

*Sheckler*, 7 BLR 1-128, 1-131; *see also Stanford v. Valley Camp Coal Co.*, 7 BLR 1-906 (1985); *Chancey v. Consolidation Coal Co.*, 7 BLR 1-240 (1984). The administrative law judge acted within his discretion in according greater weight to the readings of the physicians who possessed superior radiological qualifications, and we affirm his finding that the weight of the evidence was negative for pneumoconiosis at Section 718.202(a)(1), as supported by substantial evidence. *See Brandolino*, 90 F.3d 1502, 20 BLR 2-302.

Regarding the medical opinion evidence at Section 718.202(a)(4), claimant contends that the administrative law judge failed to comply with the Administrative Procedure Act (APA), 5 U.S.C. §557(c)(3)(A), as incorporated into the Act by 5 U.S.C. §554(c)(2), 33 U.S.C. §919(d), 30 U.S.C. §932(a), in not resolving, with a scientific rationale, the dispute raised by competing medical theories and the underlying causation theories. Claimant's Brief at 13-29. Claimant also contends that the administrative law judge failed to compare the physicians on their respective expertise in black lung and occupational lung diseases. Claimant's Brief at 29-31. Claimant's arguments are without merit. In finding that clinical pneumoconiosis had not been established, *see* 20 C.F.R. §718.201(a)(1), the administrative law judge determined that Drs. Renn and Repsher found no evidence of the disease, and he permissibly discounted Dr. Cohen's positive diagnosis that was based in part on inadmissible x-rays, and Dr. Shockey's diagnosis of coal workers' pneumoconiosis that was based on his positive x-ray interpretation. Decision and Order at 20; *see Dempsey*, 23 BLR 1-47; *Anderson*, 12 BLR 1-111. Considering the issue of legal pneumoconiosis, the administrative law judge reviewed the opinions of Drs. Shockey, Cohen, and Parker, Director's Exhibit 11, Claimant's Exhibit 5, 6, 13, 14, who opined that claimant's obstructive impairment was due at least in part to his coal mine employment, and the contrary opinions of Drs. Renn and Repsher, Director's Exhibit 23, Employer's Exhibit 4, 10, 14, who determined that claimant's impairment was due entirely to smoking. The administrative law judge found that each doctor was extremely qualified in pulmonary medicine and that every report was well reasoned and well supported by its underlying documentation. Decision and Order at 9-22. After discussing these reports and finding that the conflicting opinions were evenly balanced and entitled to equal weight, the administrative law judge permissibly concluded that claimant failed to establish the existence of legal pneumoconiosis, as defined at Section 718.201(a)(2), by a preponderance of the evidence. Decision and Order at 22; *Director, OWCP v. Greenwich Collieries [Ondecko]*, 512 U.S. 267, 18 BLR 2A-1 (1994), *aff'g sub nom. Greenwich Collieries v. Director, OWCP*, 990 F.2d 730, 17 BLR 2-64 (3d Cir. 1993). Claimant's additional arguments are essentially a request to reweigh the evidence, which is beyond the Board's scope of review. *See Anderson*, 12 BLR 1-111. Accordingly, we affirm the administrative law judge's finding that the evidence is insufficient to establish either clinical or legal pneumoconiosis pursuant to 20 C.F.R. §718.202(a)(4).

4

A 27

The administrative law judge addressed all relevant evidence, assigned the evidence appropriate weight, and provided valid reasons for his credibility determinations. Thus, his Decision and Order comports with the requirements of the APA. *Wojtowicz v. Duquesne Light Co.*, 12 BLR 1-162 (1989). As his findings are supported by substantial evidence, we affirm the administrative law judge's finding that the evidence is insufficient to establish the existence of pneumoconiosis pursuant to 20 C.F.R. §718.202(a). Consequently, we affirm the administrative law judge's denial of benefits. *See Anderson*, 12 BLR 1-111.

Accordingly, the administrative law judge's Decision and Order – Denying Benefits is affirmed.

SO ORDERED.


NANCY S. DOLDER, Chief
Administrative Appeals Judge


ROY P. SMITH
Administrative Appeals Judge


BETTY JEAN HALL
Administrative Appeals Judge

5

A 28